**Fanny PAIGE et al., Plaintiffs,**

v.

**James GRAY, Mayor of the City of Albany, Georgia, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**CITY OF ALBANY et al., Defendants.**

**Civ. A. Nos. 74–50–Alb, 75–27–Alb.**

United States District Court,
M. D. Georgia,
Albany Division.

Aug. 16, 1975.

**460**

Mary M. Young, Alfred O. Bragg, III, William Joseph Baird, Jr., Albany, Ga., David F. Walbert, Atlanta, Ga., Edward H. Levi, Atty. Gen., Dept. of Justice Washington, D. C., Ronald T. Knight, U. S. Atty., Macon, Ga., Michael Johnson, Atty., Dept. of Justice, Civil Rights, Washington, D. C., for plaintiffs.

James V. Davis, Edmund A. Landau, Albany, Ga., for defendants.

OWENS, District Judge:

Fanny Paige, Erma Moss, Mary Young and Grady Caldwell, individually and as representatives of a class [1] of all black citizens of the City of Albany entitled to vote therein, by their complaint filed December 9, 1974, seek to invalidate the present at-large system of electing five city commissioners of the City of Albany, Georgia, who with the Mayor and Mayor Pro Tem of said city constitute all the elected officials of the board of city commissioners, Albany's governing body. The at-large system herein attacked was created by a 1947 act of the legislature of this state. 1947 Ga.Laws p. 725 (approved March 26, 1947). Preceding the enactment of said 1947 law the five city commissioners who are presently elected at-large were elected one from each of the five wards of the city by just the respective voters of each ward. 1923 Ga.Laws p. 374. The other two commissioners at least since 1923 have been elected at-large and since the enactment of 1937 Ga.Laws p. 1476 have been designated [2] as Mayor and Mayor Pro Tem. They allege that "this voting arrangement operates to deprive plaintiffs of the rights, liberties and immunities secured to them by the Fourteenth and Fifteenth Amendments to the United States Constitution." Complaint, para. 1.

The United States on July 21, 1975, filed its separate complaint also seeking to invalidate said at-large election system on constitutional grounds. Both actions were consolidated by the court on July 25, 1975, pursuant to Rule 42, Federal Rules of Civil Procedure, and motions for preliminary injunctive relief were set down to be heard on Wednesday, August 6, 1975.

---

1. Pursuant to Rule 23, Federal Rules of Civil Procedure, the court by verbal order of August 6, 1975, and written order of August 11, 1975, determined that this action could be maintained as a class action pursuant to Section (b)(1) of said rule.

2. Preceding 1937 Ga.Laws p. 1476, the seven commissioners elected one of their members as Mayor and one as Mayor Pro Tem, 1923 Ga.Laws p. 376.

The defendants by their responsive pleadings denied that Albany's at-large system violates any of plaintiffs' constitutional rights as secured to them under the Fourteenth and Fifteenth Amendments and further asserted that the 1947 at-large system since its enactment has not been used invidiously to cancel out or minimize the voting strength of the black voters of Albany thereby making it constitutional under the equal protection tests set forth by the Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

On Wednesday, August 6 and Thursday, August 7, 1975, an evidentiary hearing was held. After hearing the evidence and the argument of counsel the court issued its preliminary injunction because of its opinion that said 1947 act had the inevitable effect of abridging the right of Negro citizens of Albany to vote and is therefore violative of their rights under the Fifteenth Amendment as it was interpreted by the Supreme Court in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125,. 5 L.Ed.2d 110 (1960). A further hearing was set for Thursday, August 14 to receive suggested plans from each of the parties for (a) conducting an election this year under Albany's election scheme as it existed before the enactment of the 1947 act believed by this court to be unconstitutional and (b) redrawing the boundary lines of Albany's five wards to comply with the "one-man, one-vote" rule. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). By that preliminary injunction the parties and all persons encompassed by Rule 65, Federal Rules of Civil Procedure, were enjoined from conducting any elections based on said 1947 act. That included primary elections to be held on Tuesday, August 12, and a special election of the same date to fill a commission vacancy created by a recent resignation of a commissioner whose term would not have expired until January 1977.

Upon inquiry each party agreed that it would now be appropriate for the court to issue its permanent injunction. Plans having been presented and the evidence and contentions of the parties having been carefully considered, this constitutes the court's permanent injunction in the form required by Rule 65, Federal Rules of Civil Procedure.

The stipulated facts show that prior to 1946 black citizens were not permitted to vote in Democratic Party primary elections conducted to nominate candidates for the offices of commissioner, mayor and mayor pro tem of the City of Albany. On March 6, 1946, the United States Court of Appeals for the Fifth Circuit in the case of *Chapman v. King,* 154 F.2d 460, *cert. denied,* April 1, 1946, 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025, held that the Democratic Primary as conducted in Georgia is a part of the public election machinery as a result of which the Fifteenth Amendment to the Constitution of the United States which forbids denying or abridging the right of citizens to vote on account of race or color, prohibits the exclusion of Negro voters from Georgia's Democratic Primary. The primary elections conducted thereafter by the Democratic Party in 1946 were the first primary elections in which Negro citizens were allowed to vote.

The Democratic primary election for the City of Albany was held on November 18, 1946, for the commissioners representing the second, third and fifth wards. The stipulated facts show that 3,548 persons were registered to vote in that election and that by race and ward they were as follows:

| Race | Second Ward | Third Ward | Fifth Ward |
|------|-------------|------------|------------|
| White | 464 | 791 | 913 |
| Black | 309 | 61 | 1010 |

**462**

Blacks thus constituted more than a majority of the registered voters in the Fifth Ward.

The stipulated facts further show that in the Fifth Ward there were two whites candidates running for the nomination. Of the 1,923 voters, 353 white citizens voted and 448 Negro citizens voted—a total of 791—at what were then [3] segregated polling places. Broken down by race those 791 votes were cast as follows:

| | Candidates | |
| | Edward J. Davis | R. F. Armstrong |
| --- | --- | --- |
| White voters | 156 | 197 |
| Black voters | 384 | 64 |
| Total | 540 | 261 |

The overwhelming majority of black voters cast their votes for Edward J. Davis and a substantial majority of white voters cast their votes for R. F. Armstrong. Edward J. Davis was elected. The impact of the votes of the new black voters is readily apparent from these figures.

The legislature of this state met in 1947. By March 26 the act in question had been passed by the legislature and approved by the governor. As to the election of Albany's city officials it states:

"Section 3. The municipal government shall consist of a Mayor, who shall be also a member of the Board of City Commissioners, and shall be elected from the City at large by all the voters of said City; a Mayor Pro Tem, who shall be also a member of the Board of City Commissioners, and shall be elected from the City at large by all the voters of said City; one commissioner from each of the five wards of the City as said Wards now or may hereafter exist, *all of whom shall be elected from the City at large by all the voters of said City*. All of said Commissioners, including the Mayor and Mayor Pro Tem, shall hold office for a term of two years from

the second Monday in January in each year next following the dates of their election, and until their successors are elected and qualified.

"The first election under the terms of this Act shall be held on the first Monday in December, 1948, at which time Commissioners from the Second, Third and Fifth Wards shall be elected. An election shall be held on the first Monday in December, 1949, at which time a Mayor, Mayor Pro Tem, and Commissioners from the First and Fourth Wards shall be elected. On the first Monday in December in each year thereafter an election shall be held hereunder for the election of Commissioners to succeed those whose terms will expire on the second Monday in January next after said election. All of said elections to be under existing charter regulations of the City of Albany which are hereby continued in full force and effect." 1947 Ga.Laws p. 729. (Emphasis added).

Preceding the passage of this 1947 act, Albany's city charter of 1923 (1923 Ga.Laws p. 374), as amended by 1937 Ga.Laws p. 1476 as to the election of Albany's city officials had provided:

"That the municipal government shall consist of a mayor, who shall be also

3. Since polling places were segregated, the racial identity and thus how white and black citizens voted can be determined. Segregated polling places were used until January 8, 1962, when the practice was enjoined by this court. *Anderson v. Courson*, 203 F.Supp. 806 (1962).

a member of the board of city commissioners, who shall be elected from the city at large by all the voters of said city, one commissioner to be elected from each of the five wards of the city as said wards now or may hereafter exist, *by the voters of the respective wards,* and one commissioner to be elected from the city at large by the voters of said city at large, who shall, by virtue of his office, be mayor pro tem, all of said commissioners, including said mayor-commissioner, to hold office for a term of two years from the second Monday in January in each year next following the dates of their election, and until their successors are elected and qualified, and such other officers, servants and agents in addition to those hereinafter enumerated, as the board of city commissioners may lawfully employ and elect. The first election under the terms of this Act to be held the first Monday in December, 1937, under existing election laws, and present and existing City of Albany charter regulations and laws which are hereby continued in full force and effect." (Emphasis added).

The 1947 act as to the election of Albany's five commissioners thus eliminated the words "by the voters of the respective wards" and substituted the words "all of whom shall be elected from the City at large by all the voters of the City." This change of course meant that all registered voters of the City of Albany would for the first time vote on each of Albany's five city commissioners whereas in the past each voter had voted on the election of just one commissioner.

The November 18, 1946 second, third and fifth ward voter registration figures have already been stated. The next available figures are as of November 2, 1947. They show:

|  | First | Second | Third | Fourth | Fifth | TOTAL |
|---|---|---|---|---|---|---|
| WHITE | 338 | 457 | 776 | 1,931 | 955 | 4,457 White |
| BLACK | 234 | 361 | 61 | 281 | 1,123 | 2,060 Black |

Had the election of November 18, 1946, been conducted under the 1947 act and had the white voters of the entire city voted for R. F. Armstrong, it is obvious that the Negro voters of the entire city could not have controlled the outcome of the Davis v. Armstrong race as they actually did. As these actual voter figures by race show, the 1947 act diminished the voting power of Negro citizens of Albany from that of being part of a majority power in one ward and an approaching majority power in another ward to that of being part of a minority power in the entire city. It absolutely diminished or reduced the majority power that Fifth Ward black citizens had just used to elect a Fifth Ward commissioner of their choice.

The Fifteenth Amendment to the Constitution of the United States provides:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

■ To prove that the right to vote has been denied or abridged on account of race or color in violation of the Fifteenth Amendment, the plaintiffs are not required to establish by evidence that the individual persons who caused this 1947 law to be enacted—the legislators, the then Mayor, Mayor Pro Tem and City Commissioners "etc"—devised it for the express purpose of denying or abridging the right of Negro citizens of Albany to vote or that they specifically intended for this law to result in a denial or an abridgement of the right of Negro citizens to vote. Instead, as

the Supreme Court of the United States on November 14, 1960, in *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (an Alabama case challenging the constitutionality of an act of the Alabama legislature which redefined the boundaries of Tuskegee, Alabama, so as to exclude all but 4 or 5 of Tuskegee's 400 Negro voters) has already decided, plaintiffs are only required to demonstrate that this 1947 act changing Albany's method of electing city commissioners has the inevitably effect of depriving Negro citizens of their votes and of the consequent advantages that the ballot affords them.

As the Supreme Court said in *Gomillion v. Lightfoot, supra*:

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. . . ." 364 U.S. at 347, 81 S.Ct. at 130, 5 L.Ed.2d at 117.

\* \* \* \* \* \*

" . . . Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution. . . ." 364 U.S. at 344, 81 S.Ct. at 129, 5 L.Ed.2d at 115.

\* \* \* \* \* \*

"It is difficult to appreciate what stands in the way of adjudging a statute *having this inevitable effect* invalid in light of the principles by which this Court must judge, and uniformly has judged, statutes that, however speciously defined, obviously discriminate against colored citizens. 'The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination.' *Lane v. Wilson*, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287." 364 U.S. at 342, 81 S.Ct. at 127, 5 L.Ed.2d at 113 (emphasis added).

For this trial court it is likewise difficult to appreciate what stands in the way of adjudging this 1947 act having the inevitable effect of reducing Negro voters residing in one of five wards of Albany—one-fifth of Albany's entire population—from a majority to a minority status, invalid in light of the Fifteenth Amendment as it plainly reads and as applied by the Supreme Court in *Gomillion, supra*.

■ The evidence as already recited demonstrates that the 1947 act of the Georgia legislature which eliminated the election of Albany's five city commissioners by just the voters of each respective ward, reduced the Negro voters of the Fifth Ward from a majority of the total registered voters status to a minority of the total registered voters status. This deprived them of the opportunity they theretofore possessed and had used on November 18, 1946, to combine votes and cause the election of the candidate of their choice. This is the inevitable effect of this statute. As such it obviously had the effect of denying or abridging the right of Negro citizens of Albany to vote on account of their race. This contravenes the Fifteenth Amendment and makes the 1947 act unconstitutional.

Plaintiffs also contended and defendants vigorously denied that the 1947 act abolishing ward elections is unconstitutional because it also violates the equal protection clause of the Fourteenth Amendment which states:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any persons within its jurisdiction the equal protection of the laws.*" (Emphasis added).

The evidence consists of interrogatories, admissions, stipulations, depositions, exhibits, charts, maps, affidavits and witnesses heard in the courtroom, virtually all of which was presented by each side to prove their respective equal protection contentions. Both sides have submitted extensive, excellent briefs that demonstrated the legal foundation of their positions, and the court has carefully considered them.

The plaintiffs and defendants have focused on the Supreme Court's application of the equal protection clause to election schemes in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and the Fifth Circuit Court of Appeals application of *White v. Regester* in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), and *Turner v. McKeithen*, 490 F.2d 191 (5th Cir. 1973). In effect both plaintiffs and defendants suggest that these cases stand for the proposition that Albany's at-large system of electing city commissioners—its multimember district election scheme—is not per se unconstitutional under the equal protection clause but may be shown to be unconstitutional under the equal protection clause by proof that Albany's at-large or multimember system is being used invidiously or purposely to cancel out or minimize the voting strength of a racial group,. Albany's Negro citizens. They thereby suggest that even if the 1947 act were constitutional when enacted, it may have become unconstitutional by being used invidiously or purposely by Albany's elected public officials to cancel out or minimize the voting strength of Albany's Negro citizens over a period of twenty-eight years. They in effect suggest that the constitutionality of the 1947 act is to be determined by hindsight which reminds the court of the old saying that "perfect vision is 20–20 hindsight."

In examining the suggested meaning of *White v. Regester, Zimmer v. McKeithen, Turner v. McKeithen* and the cases cited and relied on by the Supreme Court and the Fifth Circuit Court of Appeals, this court observed that in each instance a recently enacted or court ordered election scheme—*White v. Regester* considered the 1970 reapportionment plan for the Texas House of Representatives; *Zimmer v. McKeithen* considered an election apportionment scheme recently fashioned by a United States District Court for local Louisiana parish elections; *Turner v. McKeithen* considered a 1971 reapportionment plan as fashioned by the same United States District Court for local elections in another Louisiana parish—was examined in the light of the equal protection clause and the historical access of members of the Negro race to the political processes leading to nomination and election during the years preceding the legislative enactment or court order. This court has not found nor has counsel suggested an appellate or Supreme Court decision [4] in which an election scheme enacted some 28 years ago and not otherwise unconstitutional, has been determined to be violative of the equal protection clause because of the conduct of the public officials elected under the 28 year old scheme. If the equal protection clause were so interpreted, the United States courts would be continuously called upon to determine the present fairness towards all racial elements of all existing election schemes of our 50 states and thousands of local governments regardless of how long those schemes may have existed and regardless of whether or not when enacted they impinged upon the constitutional rights of the citizenry. United States courts would indeed supplant all legislative judgment. Certainly that is not the intention of the Constitution of the United States, any of its amendments or any law enacted by Congress. This is still a government of laws and not of men, because of which this court does not believe it to be its duty or

---

4. The court's attention has been directed to the case of *Pitts v. Busbee*, et al., 395 F.Supp. 35 (N.D.Ga.1975), in which the district court invalidated Fulton County's 1952 at-large scheme by applying *White v. Regester* in the light of post-1952 events.

responsibility to pass constitutional judgment on this 1947 act in the light of events transpiring after and not before 1947.

Admittedly it would be possible to examine Albany's 1947 act in the light pre-1947 racial and social conditions and then to apply the tests of *White v. Regester* as if it had already been decided. But *White v. Regester* and the cases therein relied on—*Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); *Lucas v. Forty-Fourth Colorado General Assembly*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), to mention a few—all came more than fifteen years after the election scheme here under attack was legislatively created. Rarely are such sweeping advancements in the meaning of our Constitution applied retroactively. This is not in the court's best judgment a case that calls for or permits retroactive application of the decisions of the Supreme Court. See *Chevron v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 30 L.Ed.2d 296, 306 (1971). Even if it were, its clear violation of the Fifteenth Amendment at the time of its legislative enactment in 1947 would make that task unnecessary.

The 1947 act of the Georgia legislature when enacted and now is therefore unconstitutional. The Georgia legislature will meet in January 1976 at which time it can, subject to the provisions of the Voting Rights Act as recently extended by Congress to again cover just the southern states, enact an election scheme for Albany that will pass constitutional muster and the hurdles of the Voting Rights Act. Until the legislature does that, it is this court's responsibility to equitably fashion a decree solving the following problems created by this court's determination that Albany's 1947 act is unconstitutional:

(a) The present status and duration of office of Albany's seven elected city officials all of whom were elected pursuant to the unconstitutional 1947 act.

(b) The time frame for conducting the primary and special elections that would have been held on Tuesday, August 12, but because of this court's order were not held.

(c) The geographical boundaries of each of Albany's five wards which all parties concede now violate the "one-man, one-vote rule".

At the time of the preliminary injunctive hearing on August 6, 1975, a primary election to nominate candidates for the office of Mayor, Mayor Pro Tem, Commissioner representing the First Ward and Commissioner representing the Fourth Ward—all of whose terms under said 1947 act or its predecessor acts expire in January 1976—was scheduled for Tuesday, August 12. Candidates had qualified and the registration books had been closed. A special election to fill a vacancy created by the recent resignation of the commissioner representing the Third Ward which term would not have otherwise expired until January 1977, was also scheduled for August 12. At the time of this court's hearing elections were thus about to be conducted for five of Albany's seven elected officials. Absent this case the remaining two commissioners representing the second and fifth wards and the new specially elected third ward commissioner would be elected again in the fall of 1976 for new terms beginning January 1977.

■ The status of publicly elected officials determined to have been elected under an unconstitutional law or apportionment scheme is well settled under Georgia law. See *Tarpley v. Carr*, 204 Ga. 721, 51 S.E.2d 638 (1949). Until they by virtue of the equitable order of the court are succeeded in office by duly and newly elected oficials, they are each de facto in office, and possess and have the duty and responsibility of exercising all of the powers given them

by the charter of the City of Albany excepting only that portion herein determined to be unconstitutional.

This case was advanced on the court's calendar that would have normally caused it to be heard in September so as to avoid the possibility of having to void in September a primary and special election just held in August. This decision therefore comes before the regularly scheduled election of November 4, 1975, and in ample time for newly scheduled primary elections to be held within the time frame of the Georgia Municipal Election Code.

██ If elections were not already scheduled to be held this fall for five of Albany's seven elected officials, this court would not have acted as quickly as it has. Instead, it would have adopted the defendants' suggestion that present city officials be permitted to remain de facto in office until the 1976 legislature has been given the opportunity to pass a legislative remedy both as to an election plan and the drawing of ward boundaries. Elections, however, being about to be held, the court if it were to adopt that suggestion would be countenancing and approving not an existing to be cured next year problem—but instead a new, regular election to be conducted under a law that is now and since 1947 has been unconstitutional because it violates one of the most precious possessions that *all citizens* have—the right to vote. To do so would be to irreparably harm the right not of just the plaintiffs but of every citizen to vote for the elected officials of their city government. The court therefore declines that suggestion. Since an election for five officials is about to be held, the remaining two commission posts can be included in the election without much greater expense and difficulty than the already scheduled but rearranged elections will cause. Accordingly, the court in the exercise of its equitable discretion does hereby specify that the present Mayor, Mayor Pro Tem, and five Commissioners of the City of Albany shall remain de facto in office until the second Monday in January 1976 at which time they shall vacate and surrender their respective offices to their successors duly elected pursuant to this order and the laws of Georgia and qualified.

The parties have each suggested a time schedule for a qualifying period and for the holding of primary elections keeping in mind the court's expressed desire to conform to the existing November 4, 1975, date of the general election. The plaintiffs have suggested that the court should also provide for an additional period of voter registration preceding the primary election.

After giving careful consideration to all suggestions made the court does hereby order that elections to fill the offices of Mayor, Mayor Pro Tem, First Ward Commissioner, Second Ward Commissioner, Third Ward Commissioner, Fourth Ward Commissioner, and Fifth Ward Commissioner be held on the following dates:

(1) Primary elections—Tuesday, October 7, 1975.

(2) Primary run-off election, if necessary, Tuesday, October 14, 1975.

(3) Qualifying period for candidates desiring to run in any primary election shall end at 5:00 p. m., Friday, August 29, 1975.

(4) General election—Tuesday, November 4, 1975.

The evidence does not indicate that Negro citizens of Albany have had anything less than a full, fair opportunity to register to vote. Indeed, as the court has publicly observed, the evidence shows that the Voting Registrar of Albany and Dougherty County, along with all who assist him, has "bent over backwards" to get all citizens, including particularly black citizens, to register to vote. If any citizen has not registered, it is solely because he did not wish to do so. The court looks upon this court-ordered primary election as an August 12, 1975, primary delayed to a later date by court order. The list of registered voters eligible to vote in the delayed primary shall be prepared

as if the election were being held on August 12.

The court has carefully considered all of the suggested plans of the parties for redrawing the ward boundaries of Albany's five wards to conform to the "one-man, one-vote rule". The practical difficulties and the almost impossible task of rearranging and changing existing voter registration cards and lists was not given sufficient consideration by the parties. Accordingly, the court considering the plans of all parties with a view toward changing as few existing election districts as possible has reapportioned the five wards of the City of Albany so that they shall be as shown on the attached map of Albany, Exhibit "A".

So as to conform to the charter of the City of Albany as it existed before the enactment of said unconstitutional act, the terms of the officials of the City of Albany elected in the elections herein ordered shall expire on the following dates:

(a) Mayor, Mayor Pro Tem, First Ward Commissioner and Fourth Ward Commissioner on the second Monday in January 1978.

(b) Second Ward Commissioner, Third Ward Commissioner and Fifth Ward Commissioner on the second Monday in January 1977.

The court during these proceedings questioned the sufficiency of the compliance by the City Democratic Executive Committee of Albany with Sections 34A–801 and 802 of the Municipal Election Code of Georgia. On August 14, 1975, documents sufficient to comply with those sections were furnished to the court. When furnished to the proper parties, they will be sufficient to qualify said committee to hold a primary election under this order.

In all other respects the elections to be held hereunder shall be conducted in accordance with the laws of Georgia.

Jurisdiction is retained to pass such further orders as may be necessary to effect this order.

This constitutes the order of the court enjoining and prohibiting elections to be held for the heretofore named officials of the City of Albany in any manner inconsistent with this order. It shall remain in full force and effect until further order of the court.

So ordered.

## EXHIBIT A

Based on the population of election districts in use in 1974 as shown on plaintiffs' demographic information, and taking into account the departure of 4,175 persons due to the closing of the Naval Air Station and the annexation of territory in election districts 14 and 15 in which, according to information submitted by the government, some 381 persons live, the court finds the total present population of the City of Albany to be 70,762, and the ideal population of each ward to be 14,152. Using the above information along with the July 1973 *Georgia Population Report* and *Characteristics of Housing Units and Population, by Blocks: 1970*, the court finds that the demographic characteristics of each ward as outlined on the attached map are as follows:

| WARD | Total Population | Deviation | Population by Race (Percentage) White | Black |
|---|---|---|---|---|
| 1 | 14,153 | + 0.007% | 11,242 (79.4%) | 2,911 (20.6%) |
| 2 | 14,189 | + 0.261% | 5,122 (36.1%) | 9,067 (63.9%) |
| 3 | 13,815 | − 2.381% | 200 (1.4%) | 13,615 (98.6%) |
| 4 | 14,361 | + 1.477% | 12,374 (86.2%) | 1,987 (13.8%) |
| 5 | 14,244 | + 0.650% | 13,951 (97.9%) | 293 (2.1%) |
| TOTALS | 70,762 | | 42,889 (60.6%) | 27,873 (39.4%) |

Ideal Ward Population = 14,152

Total Population Deviation = 3.858%