**Fanny PAIGE et al., Plaintiffs,**

**v.**

**James GRAY et al., Defendants.**

**Civ. A. No. 74–50–ALB.**

United States District Court,
M. D. Georgia,
Albany Division.

Aug. 24, 1977.

Mary M. Young, Albany, Ga., David F. Walbert, Atlanta, Ga., Alfred O. Bragg, III, Macon, Ga., for plaintiffs.

Frederick J. McGrath, Dept. of Justice, Washington, D. C., for United States. James V. Davis, Albany, Ga., for defendants.

OWENS, District Judge:

Article III of the Constitution of the United States vests the judicial power of the United States in the Supreme Court of the United States and "in such inferior Courts as the Congress may from time to time ordain and establish." Congress pursuant to that authority established our present lower federal court system—

(a) United States District Courts are trial courts in which all cases generally begin and are tried either before a jury or before just a judge. There are presently 94 such courts in our 50 states and various territories and possessions; this court is one of those 94.

(b) United States Courts of Appeals are appellate courts to which those who are dissatisfied with the judgment of a district court have the right to appeal. There are presently eleven such courts of appeal.

The judicial power of the United States according to Article III of the Constitution "shall extend to all Cases, in Law and Equity arising under this Constitution, the Laws of the United States . . . ; —to Controversies to which the United States shall be a Party . . . ." Congress has specified by laws to what extent and under what circumstances this judicial power is to be exercised by each of our federal courts. 28 U.S.C. § 1251, *et seq.*

Following the end of the Civil War between 1865 and 1870, the Constitution of the United States which was then 78 years old and had been amended on only three[1] occasions, was further amended to outlaw slavery—Amendment XIII; to make all persons citizens of these United States and command each State to afford citizens their constitutional rights including due process and equal protection of the law—Amendment XIV; and to prohibit denial or abridgement of the right to vote on account of race, color or previous condition of servitude—Amendment XV.

This public controversy concerns the manner in which two of these three amendments—XIV and XV—as they have been interpreted and applied by the Supreme Court and lower federal courts require the revision of Albany, Georgia's legislatively created at-large, multi-member system of electing its governing body of seven city commissioners under which (a) two of those commissioners run for the posts of mayor and mayor pro tem and are voted upon by all the voters and (b) five of those commissioners are respectively required to reside in one of five wards but are voted upon by all the voters of the city.

### THE FOURTEENTH AMENDMENT

The Fourteenth Amendment as it is here applicable provides:

---

1. (a) Amendment I through X, the Bill of Rights, were proposed as a group by the First Congress in 1789 and ratified by December 15, 1791.

 (b) Amendment XI limiting federal judicial power was proposed in 1794 and ratified by January 8, 1798.

 (c) Amendment XII, election of the President and Vice-President by the Electors, was proposed in 1803 and ratified by September 25, 1804.

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.* (emphasis added).

■ The "primary concern [of the framers of this amendment] was the establishment of equality in the enjoyment of basic civic and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color. [As early as 1873 the Supreme] Court announced that the provisions of the Amendment are to be construed with this in mind." *Shelley v. Kraemer*, 334 U.S. 1, 23, 68 S.Ct. 836, 847, 92 L.Ed. 1161 (1947).

■ Among the basic civic and political rights that have been found to be protected and preserved from discriminatory action on the part of states is the right of suffrage—the right or privilege of casting a vote at public elections. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ The election process equality established by this Amendment, includes not only the famous "one-person, one-vote" rule of *Baker v. Carr, supra; Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), but also includes as to state created multi-member election district schemes, the prohibition

that such districts may not "operate to minimize or cancel out the voting strength of racial or political elements of the voting population." *Whitcomb v. Chavis*, 403 U.S. 124, 143, 91 S.Ct. 1858, 1869, 29 L.Ed.2d 363 (1971).

■ To sustain a challenge that multi-member election districts are unconstitutional because they operate to minimize or cancel out the voting strength of racial or political elements of the voting population, the challengers must carry the "burden of proving that multi-member districts operate to dilute or cancel the voting strength of racial or political elements." Such proof "focus[es] not on population-based apportionment ["one-man, one-vote" rule] but on the quality of representation afforded [the challengers] by the multi-member district [arrangement] as compared with single-member districts." *Id.* at 142, 91 S.Ct. at 1868.

■ When challengers factually prove that multi-member districts operate to dilute or cancel the voting strength of racial or political elements, they thereby establish that such a scheme denies them the inalienable right—derived from the Equal Protection Clause of the Fourteenth Amendment—that each and every citizen has full and effective participation in the political processes of his State's legislative bodies. *Reynolds v. Sims*, 377 U.S. at 565, 84 S.Ct. 1362.

■ Multi-member districts even though they have certain undesirable features,[2] are not *per se*[3] illegal under the Equal Protection Clause. *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966);

---

2. "Criticism is rooted in their winner-take-all aspects, their tendency to submerge minorities and to overrepresent the winning party as compared with the party's statewide electoral position, a general preference for legislatures reflecting community interests as closely as possible and disenchantment with political parties and elections as devices to settle policy differences between contending interests.

"The chance of winning or significantly influencing intraparty fights and issue-oriented elec-

tions has seemed to some inadequate protection to minorities, political, racial, or economic; rather, their voice, it is said, should also be heard in the legislative forum where public policy if finally fashioned." 403 U.S. at 158, 91 S.Ct. at 1877.

3. *Per se* means "by himself or itself; in itself; taken alone; inherently; in isolation; unconnected with other matters." Black's Law Dictionary, Rev. 4th Ed.

*Kilgarlin v. Hill*, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). In the absence of factual proof of dilution or cancellation multi-member districts therefore do afford citizens the equal protection of the law that comes from the Fourteenth Amendment and are not unconstitutional under the Equal Protection Clause. *Dusch v. Davis*, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Dallas County v. Reese*, 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975). The Constitution simply does not demand "that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district." *Whitcomb, supra,* 403 U.S. at 156, 91 S.Ct. at 1875.

■ Factual proof of dilution or cancellation is derived from an examination of the manner in which the multi-member system has performed or actually worked in past years—"the real-life impact of multi-member districts on individual voting power . . . ." *Whitcomb, supra,* at 146, 91 S.Ct. at 1870. It is not derived from a theoretical projection of the effect that a multi-member system will have in years to come. *East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

The sufficiency of the required proof of dilution or cancellation of the voting strength of racial or political elements is demonstrated by *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the first decision of the Supreme Court of the United States finding that the facts proven before the district court did establish dilution or cancellation violative of the Equal Protection Clause and setting forth those facts as the Supreme Court perceived them to be.

## IN WHITE v. REGESTER

The Court considered the constitutional validity of multi-member legislative elec-tion districts created by the State of Texas' reapportionment plan for Dallas and Bexar counties and found by the district court to be constitutionally invalid because of being invidiously [4] discriminatory against Negroes in Dallas county and Mexican-Americans in Bexar county.

Note the language of the Supreme Court: "We affirm the District Court's judgment, however, insofar as it invalidated the multimember districts in Dallas and Bexar Counties and ordered those districts to be redrawn into single-member districts. Plainly, under our cases, multi-member districts are not per se unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts in other parts of the State. (citations omitted). But we have entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups. See *Whitcomb v. Chavis*, supra; *Burns v. Richardson*, supra; *Fortson v. Dorsey*, supra. To sustain such claims, it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice. *Whitcomb v. Chavis*, supra, 403 U.S. at 149–150, [91 S.Ct. at 1872], 29 L.Ed.2d 363.

"With due regard for these standards, the District Court *first referred to the history of official racial discrimination* in Texas, which at times touched the right of Negroes to register and vote and to participate in the democratic processes. [*Graves v. Barnes* ] 343 F.Supp. [704], at 725. It referred also to the *Texas rule requiring a majority vote* as a prerequi-

---

**4.** Invidious means: "1. Tending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating; as, *invidious* distinctions." *Websters New International Dictionary*, Second Edition.

site to nomination in a primary election and to the so-called *'place' rule* limiting candidacy for legislative office from a multimember district to a specified 'place' on the ticket, with the result being the election of representatives from the Dallas multimember district reduced to a head-to-head contest for each position. These characteristics of the Texas electoral system, neither in themselves improper nor invidious, enhanced the opportunity for racial discrimination, the District Court thought. More fundamentally, it found that *since Reconstruction days, there have been only two Negroes in the Dallas County delegation* to the Texas House of Representatives and that *these two were the only two Negroes ever slated* by the Dallas Committee of Responsible Government (DCRG), *a white-dominated organization that is in effective control of Democratic Party candidate slating in Dallas County.* That organization, the District Court found, did not need the support of the Negro community to win elections in the county, and *it did not therefore exhibit good-faith concern for the political and other needs and aspirations of the Negro community.* The court found that as recently as 1970 the DCRG was relying upon 'racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community.' Id., at 727. Based on the evidence before it, the District Court concluded that '*the black community has been effectively excluded from participation in the Democratic primary selection process,*' id., at 726, and was therefore *generally not permitted to enter into the political process in a reliable and meaningful manner.* These findings and conclusions are sufficient to sustain the District Court's judgment with respect to the Dallas multimember district and, on this record, we have no reason to disturb them. "The same is true of the order requiring disestablishment of the multimember district in Bexar County. Consistently with *Hernandez v. Texas,* 347 U.S. 475, [74 S.Ct. 667], 98 L.Ed. 866 (1954), the District Court considered the Mexican-Amer-

icans in Bexar County to be an identifiable class for Fourteenth Amendment purposes and proceeded to inquire whether the impact of the multimember district on this group constituted invidious discrimination. Surveying the historic and present condition of the Bexar County Mexican-American community, which is concentrated for the most part on the west side of the city of San Antonio, the court observed, based *upon prior cases and the record before it,* that the Bexar community, along with other Mexican-Americans in Texas, had long '*suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others.*' 343 F.Supp. at 728. The bulk of the Mexican-American community in Bexar County occupied the Barrio, an area consisting of about 28 contiguous census tracts in the city of San Antonio. Over 78% of Barrio residents were Mexican-Americans, making up 29% of the county's total population. The Barrio is an area of poor housing; its residents have low income and a high rate of unemployment. The typical Mexican-American suffers a cultural and language barrier that makes his participation in community processes extremely difficult, particularly, the court thought, with respect to the political life of Bexar County. '[A] cultural incompatibility . . . conjoined with the poll tax and the most restrictive voter registration procedures in the nation *have operated to effectively deny Mexican-American access to the political processes* in Texas even longer than the Blacks were formally denied access by the white primary.' 343 F.Supp., at 731. The residual impact of this history reflected itself in the fact that Mexican-American voting registration remained very poor in the county and that, only five Mexican-Americans since 1880 have served in the Texas Legislature from Bexar County. Of these, only two were from the Barrio area. The District Court also concluded from the evidence that the Bexar County legislative delegation in the House was insuffi-

ciently responsive to Mexican-American interests.

"Based on the *totality of the circumstances*, the District Court evolved its ultimate assessment of the multimember district, overlaid, as it was, on the cultural and economic realities of the Mexican-American community in Bexar County and its relationship with the rest of the county. Its judgment was that Bexar County Mexican-Americans 'are *effectively removed from the political processes* of Bexar [County] in violation of all the Whitcomb standards, whatever their absolute numbers may total in that County.' Id., at 733. Single-member districts were thought required to remedy 'the effects of past and present discrimination against Mexican-Americans,' ibid., and to bring the community into the full stream of political life of the county and State by encouraging their further registration, voting, and other political activities.

"The District Court apparently paid due heed to *Whitcomb v. Chavis*, supra, did not hold that every racial or political group has a constitutional right to be represented in the state legislature, but did, from its own special vantage point, conclude that the multimember district, as designed and operated in Bexar County, invidiously excluded Mexican-Americans from effective participation in political life, specifically in the election of representatives to the Texas House of Representatives. On the record before us, we are not inclined to overturn these *findings*, representing as they do a *blend of history and an intensely local appraisal of the design and impact of the Bexar County multimember district in the light of past and present reality*, political and otherwise." 412 U.S. 765–770, 93 S.Ct. 2339. (emphasis added).

The detailed facts as found by the district court of three judges are set forth in their lengthy opinion beginning at 343 F.Supp. 704 and ending at 737. In affirming the district court's conclusion that those facts prove that these multi-member districts in-

vidiously discriminate against blacks and Mexican-Americans, it is significant that the Supreme Court in the aforesaid took particular note as to Dallas County of

(1) this history of official racial discrimination in Texas,

(2) the Texas rule requiring a majority vote,

(3) the so-called "place" rule,

(4) the election since Reconstruction days of only two Negroes both of whom were slated or sponsored by a white-dominated group in control of the Democratic party, and

(5) the lack of concern of the said white dominated group for the needs and aspirations of the Negro community whose support was not needed to win elections—in affirming the District Court's conclusion that "the black community has been effectively excluded from participation in the Democratic primary selection process."

It is also significant to note as to Bexar County that the trial court's findings are described as "a blend of history and an intensely local appraisal of the design and impact of the Bexar County multimember district in the light of past and present reality, political and otherwise." It is further important to note that before reaching that conclusion the Court mentions invidious discrimination and treatment of Mexican-Americans in the fields of education, employment, economics, health, politics and others, their past and present suffering; and the residual impact of this history.

 Even though lower federal courts have applied the holding of *White v. Regester*, it remains the only decision of the Supreme Court setting forth its approval of a factual finding by a trial court of dilution. It is therefore "the" standard [5] by which claims of dilution are to be judged.

## THE FIFTEENTH AMENDMENT

The Fifteenth Amendment provides:

"Section 1. The right of citizens of the United States to vote shall not be denied

5. Unlike *Whitcomb v. Chavis, supra*, and *White v. Regester, supra*, both of which concerned the constitutional validity of multimember election district plans created by state government and

or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

judged factually on the past effect of such plans on the challengers, *Zimmer v. McKeithen*, 485 F.2d 1297 (*en banc*) (5th Cir. 1973), *aff'd on other grounds; East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), involved the validity of a plan created by a United States District Court to remedy mal-apportioned single-member wards. In judging the validity of the change by the District Court from ward to at-large, multi-member districts the *en banc* court of appeals did so by setting forth its views of "under what circumstances an apportionment scheme operates to minimize or cancel out the voting strength of racial or political elements of the voting population," citing in footnote 2 both *White v. Regester, supra*, and *Whitcomb v. Chavis, supra*. The apportionment scheme referred to being court created, the opinion necessarily involves not apportionment schemes in general but apportionment schemes devised by trial courts. The plan being one that had not been used prior to the District Court's order creating it, the operational circumstances can be determined only by predicting its effect on the future voting strength of the racial elements of the voting population. The appellate court recited its constitutional views and came to the conclusion that the trial court's multi-member scheme would operate to minimize or cancel out the voting strength of blacks because of which it is constitutionally impermissible; the *en banc* court ordered a return to a single-member or ward plan. At the same time the appellate court did not consider the validity of the trial court's plan under *Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971), which concerns the exercise of the trial court's discretion in devising plans to remedy mal-apportionment and which contains no expression of constitutional views. The Supreme Court in *Connor* simply had said "We agree that when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." *Id.* at 692, 91 S.Ct. at 1762.

The Supreme Court on appeal said:

(1) "The sole issue raised by this case is how compliance with the one-man, one-vote principle should be achieved in a parish (county) that is admittedly malapportioned.
* * * * * *
(2) "We granted certiorari . . . and now affirm the judgment below, but without approval of the constitutional views expressed by the Court of Appeals. . . .
(3) "The District Court, in adopting the multimember, at-large reapportionment plan,

"Section 2. The Congress shall have power to enforce this article by appropriate legislation."

was silent as to the relative merits of a single-member arrangement. And the Court of Appeals, inexplicably in our view, declined to consider whether the District Court erred under *Connor v. Johnson*, 402 U.S. 690, [91 S.Ct. 1760], 29 L.Ed.2d 268 (1971), in endorsing a multimember plan, resting its decision instead upon constitutional grounds. . .

(4) "As the en banc opinion of the Court of Appeals amply demonstrates, no special circumstances here dictate the use of multimember districts. Thus, we hold that in shaping remedial relief the District Court abused its discretion in not initially ordering a single-member reapportionment plan.
(5) "On this basis, the judgment is affirmed." 424 U.S. 636–40, 96 S.Ct. 1083, 1084.

Inexplicably the average reader may not realize, means "not explicable; incapable of being explained, interpreted, or accounted for . . ." *Websters International Dictionary*, 2d Ed., Unabridged. Accordingly, it seems the Supreme Court clearly said there is no explanation for the failure of the court of appeals to consider and apply *Connor v. Johnson* to this district court created apportionment plan. They further seem to say that *Connor v. Johnson* applied to the facts as contained in the *en banc* opinion causes us to believe that on the basis of the rule of *Connor v. Johnson* the result reached is correct. On that basis—*Connor v. Johnson* —the determination that single-member districts were preferable was affirmed. In reality the Supreme Court thereby said court-ordered reapportionment plans are to be governed by *Connor v. Johnson* and not under the constitutional views expressed by this court in *Whitcomb v. Chavis* and *White v. Regester*. In reality the Supreme Court seems to have also said the appellate court reached the right result but for the wrong reasons. Query: How can those wrong reasons be controlling in the application of *Whitcomb v. Chavis* and *White v. Regester* in this circuit to legislatively created multi-member plans? Must the enunciation of a rule by the Fifth Circuit *en banc* await the decision of a case in which the dilution constitutional theory applied? Does this not boil down to the fact that the Equal Protection Clause of the Fourteenth Amendment and the Supreme Court's derivative dilution theory prohibits discriminatory conduct on the part of states, *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947), but does not limit or control what is done by a United States District Court to remedy discriminatory conduct on the part of states?

As to this amendment the Supreme Court in 1884 in a case from Georgia explained:

"The Fifteenth Amendment of the Constitution, by its limitation on the power of the States in the exercise of their right to prescribe the qualifications of voters in their own elections, and by its limitation of the power of the United States over that subject, clearly shows that the right of suffrage was considered to be of supreme importance to the national government, and was not intended to be left within the exclusive control of the States.

\* \* \* \* \* \*

"While it is quite true, as was said by this court in *U. S. v. Reese,* 92 U.S. [214], 218 [23 L.Ed. 563, 564], that this article gives no affirmative right to the colored man to vote, and is designed primarily to prevent discrimination against him whenever the right to vote may be granted to others, it is easy to see that under some circumstances it may operate as the immediate source of a right to vote. In all cases where the former slave-holding States had not removed from their Constitutions the words 'white man' as a qualification for voting, this provision did, in effect, confer on him the right to vote, because, being paramount to the state law, and a part of the state law, it annulled the discriminating word *white,* and thus left him in the enjoyment of the same right as white persons. And such would be the effect of any future constitutional provision of a State which should give the right of voting exclusively to white people, whether they be men or women. *Neal v. Delaware,* 103 U.S. 370 [26 L.Ed. 567].

"In such cases this fifteenth article of amendment does, *proprio vigore,* substantially confer on the negro the right to vote, and Congress has the power to protect and enforce that right.

"In the case of *U. S. v. Reese,* so much relied on by counsel, this court said in regard to the Fifteenth Amendment, that 'it has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is an exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude.' This new constitutional right was mainly designed for citizens of African descent. The principle, however, that the protection of the exercise of this right is within the power of Congress, is as necessary to the right of other citizens to vote [in general] as to the right to be protected against discrimination." *Ex parte Yarbrough,* 110 U.S. 651, 665, 4 S.Ct. 152, 158, 28 L.Ed. 274.

This amendment erects no shield against private conduct regardless of how discriminatory or wrongful. It protects only against denial or abridgment by a State or by the United States. *James v. Bowman,* 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979 (1903); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). That denial or abridgment may pertain to both primary and general elections, *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), *Terry v. Adams, supra,* and can be a direct denial such as by state statute denying the right of Negroes to vote in primary elections, *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); indirect through denial of the right of Negroes to vote by those party officials who are given or delegated authority by state law to prescribe primary election rules and regulations, *Chapman v. King,* 154 F.2d 460 (5th Cir. 1946), *cert. denied* 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025; or even by withdrawal of the right to vote by gerrymander of municipal boundaries so as to shrink them and leave mainly Negro voters outside the boundaries. *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). As the Supreme Court reminded in *Gomillion* at 342, 81 S.Ct. at 127:

". . . 'The [Fifteenth] Amendment nullifies sophisticated as well as simpleminded modes of discrimination.' *Lane v. Wilson,* 307 U.S. 268, 275, [59 S.Ct. 872, 876], 83 L.Ed. 1281, 1287."

While it protects against such denials or abridgments, it has not yet been utilized by

the Supreme Court to invalidate either legislative apportionment or reapportionment plans including those that involved multi-member districts.[6]

## THIS LAWSUIT

The Fourteenth and Fifteenth Amendment having been thus interpreted and applied, the private plaintiffs—Fanny Paige, Erma Moss, Mary Young and Grady Caldwell, both individually and in behalf of all black Albany voters—filed this lawsuit on December 9, 1974, alleging that Albany's legislatively created city government consisting of seven commissioners—a mayor, mayor pro tem and five ward commissioners—all elected at large or by all the voters of the city, is violative of their constitutional rights in two respects:

(a) In 1947 the legislature amended Albany's city charter to eliminate the election of a commissioner by the voters of each of five wards and provide instead for the election of those commissioners by the voters of the entire city. Each of the five commissioners was also required to reside in one of the five wards—one commissioner from each of the five wards. The other two commissioners designated in 1937 as mayor and mayor pro tem, had been elected at large since 1923 and were not affected by the Act. This 1947 Act, 1947 Ga. Laws at 725, the plaintiffs alleged was enacted to prevent Negro voters who were then a majority of the voters in one ward and an approaching majority in a second ward, from controlling the ward election of at least one of Albany's commissioners. This they say

denied or abridged their Fifteenth Amendment rights.

(b) Regardless of the constitutional validity of the 1947 Act changing the election of five ward commissioners to an at-large, multi-member system, plaintiffs allege that Albany's legislatively enacted system of electing all seven of its commissioners by an at-large, multi-member system violates their rights under the Equal Protection Clause of the Fourteenth Amendment as interpreted by the Supreme Court in *Whitcomb v. Chavis, supra,* and *White v. Regester, supra.* They say that the political processes leading to nomination and election of Albany's seven city commissioners were not equally open to participation by Albany's Negro citizens and that Albany's Negro citizens have had less opportunity than did Albany's white citizens to participate in the political processes and to elect commissioners of their choice.

On July 21, 1975, the United States filed its similar complaint, and it was combined and consolidated with that of the individual plaintiffs into one lawsuit.

The individual plaintiffs and the United States as remedies first asked that the court upon finding the said 1947 Act to be unconstitutional, order elections to be conducted as they were before the 1947 Act— one commissioner elected by the voters of each of five wards and two commissioners, the mayor and mayor pro tem, elected at large. They further asked that the court upon finding that Albany's at-large, multi-member scheme of electing all seven of its

---

**6.** As the Supreme Court said in a footnote in *Beer v. United States* :

Footnote 14. "[9b] There is no decision in this Court holding a legislative apportionment or reapportionment violative of the Fifteenth Amendment. Cf. *Wright v. Rockefeller,* 376 U.S. 52, [84 S.Ct. 603], 11 L.Ed.2d 512. The case closest to so holding is *Gomillion v. Lightfoot,* 364 U.S. 339, [81 S.Ct. 125], 5 L.Ed.2d 110, in which the Court found that allegations of racially motivated gerrymandering of a municipality's political boundaries stated a claim under that Amendment. The many cases. in this Court involving the Fourteenth Amendment's 'one man, one vote' standard are not relevant

here. See *Reynolds v. Sims,* 377 U.S. 533, [84 S.Ct. 1362], 12 L.Ed.2d 506. But in at least four cases the Court has considered claims that legislative apportionments violated the Fourteenth Amendment rights of identifiable racial or ethnic minorities. See *Fortson v. Dorsey,* 379 U.S. 433, 439, [85 S.Ct. 498, 501], 13 L.Ed.2d 401, 405; *Burns v. Richardson,* 384 U.S. 73, 86–89, [86 S.Ct. 1286, 1293–1295], 16 L.Ed.2d 376, 387–389; *Whitcomb v. Chavis,* 403 U.S. 124, 149, [91 S.Ct. 1858, 1872], 29 L.Ed.2d 363, 379; *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314."
425 U.S. 130 at 142, 96 S.Ct. 1357, at 1364, 47 L.Ed.2d 629.

commissioners is unconstitutional, order future elections conducted on a single-member ward basis, one commissioner elected by the voters of each of seven wards. This of necessity would mean that Albany's mayor and mayor pro tem would be selected by and from the seven commissioners and would no longer be elected by the people. *See Connor v. Johnson,* 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

### AUGUST 6, 1975—HEARING

On August 6, 1975, the prayer of the plaintiffs for injunctive relief was heard. After all the evidence was presented and the parties were heard this court for reasons stated, 399 F.Supp. 459, enjoined the election of Albany's five ward commissioners on an at-large basis and ordered that future elections be held as they had been before 1947, on a single-member ward basis—one commissioner to run from each of five wards and to be voted upon only by the voters of each ward. The basis for that order was the court's finding that the 1947 Act changing to at-large elections had the inevitable effect of abridging the rights of Albany's Negro citizens to vote as that right is guaranteed by the Fifteenth Amendment. The court did not then believe the *White v. Regester* dilution theory

of the Equal Protection Clause to be applicable to the facts of this case.

### REDRAWN WARDS

At this time this lawsuit commenced Albany's five wards had not been changed since 1958 except by the enlargement of Albany's city limits through annexation. Figures furnished by the plaintiffs indicated that the population of each ward as shown by the 1970 census was:

| Ward | Total |
|---|---|
| 1 | 21,478 |
| 2 | 15,312 |
| 3 | 21,625 |
| 4 | 9,149 |
| 5 | 7,093 |

The plaintiffs contended that the "one-man, one-vote rule" of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), required that these wards be redrawn so as to be as equal as practicably possible from a population standpoint. Defendant city officials agreed that if the "one-man, one-vote rule" is applicable, the wards are malapportioned and must be redrawn. Accordingly, following the receipt of suggested plans from the plaintiffs and the defendants the court redrew Albany's wards with the following result:

| | Total | | Population by Race (Percentage) | |
|---|---|---|---|---|
| WARD | Population | Deviation | White | Black |
| 1 | 14,153 | + 0.007% | 11,242 (79.4%) | 2,911 (20.6%) |
| 2 | 14,189 | + 0.261% | 5,122 (36.1%) | 9,067 (63.9%) |
| 3 | 13,815 | − 2.381% | 200 ( 1.4%) | 13,615 (98.6%) |
| 4 | 14,361 | + 1.477% | 12,374 (86.2%) | 1,987 (13.8%) |
| 5 | 14,244 | + 0.650% | 13,951 (97.9%) | 293 ( 2.1%) |
| TOTALS | 70,762 | | 42,889 (60.6%) | 27,873 (39.4%) |

| | | |
|---|---|---|
| Ideal Ward Population | = | 14,152 |
| Total Population Deviation | = | 3.858% |

*Paige v. Gray,* 399 F.Supp. 459, 468 (D.C. 1975). Future elections were ordered held on the basis of such redrawn wards.

### APPEAL BY DEFENDANTS

The defendant City officials filed their notice of appeal immediately following the entry of the court's final order on August

16, 1975, and moved this court to stay the effect of its order pending appeal. In denying defendant's motion for a stay this court pointed out to them in footnote 1:

"Defendants should note that if *White v. Regester, supra,* were controlling, its application could result in the Mayor and Mayor Pro Tem, each of whom is in reali-

ty a commissioner, being elected from a ward instead of at-large—seven instead of five wards."

The plaintiffs on September 11 filed their notice of appeal. Almost one year later—September 15, 1976—the Fifth Circuit Court of Appeals without disagreeing with the result already reached, returned this case for this court to also consider plaintiffs' claim that Albany's system of electing its seven commissioners—Mayor, Mayor Pro Tem and five ward commissioners—at large violates their rights under the Equal Protection Clause of the Fourteenth Amendment and in the event that claim is determined to be valid, to further consider whether or not constitutional principles as formulated by the Supreme Court require the election of all of Albany's commissioners from single-member districts. 538 F.2d 1108.

## FURTHER EVIDENCE AND BRIEFS

The parties requested and the court allowed each of them to submit additional evidence by depositions and affidavits and to furnish additional briefs of law. The last of these were received June 6, 1977. All having been considered, this in its entirety constitutes the court's findings of fact and conclusions of law. Rules 52 and 65, Federal Rules of Civil Procedure.

## THE FACTS

(A) *The Structure of Albany's City Government Through the Enactment of the 1947 Charter Amendment.*

The City of Albany is today a thriving southwest Georgia trade-center of some 76,-000 persons; approximately 61% of whom are white and approximately 39% of whom are black. First created in 1838, its population by 1900 was 4,606. Its growth thereafter continued steadily as is shown by United States census figures:

| YEAR | TOTAL POPULATION |
|---|---|
| 1910 | 8,190 |
| 1920 | 11,555 |
| 1930 | 14,507 |
| 1940 | 19,055 |

| YEAR | TOTAL POPULATION |
|---|---|
| 1950 | 31,155 |
| 1960 | 55,890 |
| 1970 | 72,623 |

Albany's municipal government at the time of its creation by the legislature of this State was five named individuals who were designated as commissioners and given terms of office to expire with the election of their successors in 1840; there was no provision for a mayor. 1838 Ga.Laws at 128. In 1841 the charter was amended by the legislature to provide for a mayor and six councilmen all elected at large; the mayor was given no special powers and apparently had a vote as a member of the council. 1841 Ga.Laws at 52. While over the years there were many amendments enumerating the responsibilities and powers of the mayor, Albany's municipal government until 1921 continued to consist of a mayor and six councilmen all elected at large. That year there was a legislative amendment providing for the city to be divided into six wards with five councilmen to be elected just by the voters of each of five wards and one councilman to reside in the sixth ward but be elected by the voters of the entire city. The at-large councilman rotated from ward to ward with each election. 1921 Ga.Laws at 641. The mayor's office remained unchanged.

The year 1922 brought further change. The mayor and six councilmen were replaced by a Board of City Commissioners consisting of five commissioners elected from single-member wards. The commissioners elected a chairman of the board who acted as ex officio mayor for ceremonial purposes, and the commissioners hired a city manager who had the responsibility of operating the city. 1922 Ga.Laws at 457.

1923 brought a completely revised city charter providing for a board of seven commissioners with five elected from single-member wards and two elected at large. Each commissioner served two years, and they elected one of their members as mayor to serve a one year term. 1923 Ga.Laws at 370. A 1937 charter amendment designated one at-large commissioner post as mayor and the other post as mayor pro tem. 1937

Ga.Laws at 1476. This system remained in effect until 1947 when the legislature passed an amendment to provide for a total of seven commissioners, five to reside in each of five wards but to be elected at large or by all the voters of the city and the other two, one the mayor and the other the mayor pro tem, to continue to be elected at large. 1947 Ga.Laws at 734.

(B) *The Circumstances Surrounding the Enactment of the 1947 Charter Amendment.*

Prior to the March 6, 1946, decision of the United States Court of Appeals for the Fifth Circuit in the case of *Chapman v. King,* 154 F.2d 460, *cert. denied* 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025, only white Georgians could vote in the Democratic primary election. The Democratic primary election was the only election in which there was a real contest, and whoever won usually prevailed in the general election. Negro citizens therefore could not vote in the only meaningful election. While Albany's population was between 19,055 (1940 table) and 31,155 (1950 total), and while its percentage of black citizens was at least as great as today, only 301 of Albany's Negro citizens had registered to vote before 1946.

*Chapman v. King* held the primary election to be part of the state election machinery encompassed by the Fifteenth Amendment's prohibition of denial of the right to vote on account of race or color. Negroes could thus vote in the Democratic primary for the first time.

In 1946 an additional 1,563 Albany Negroes registered to vote making a total of 1,864 black voters registered to participate in Albany's 1946 primary and general elections for city officials.

The Albany Herald, then and now Albany's only local daily paper, on October 29, 1946, reported:

3,548 REGISTERED TO VOTE IN CITY PRIMARY NOV. 18

Three thousand five hundred and forty-eight Albanians are registered to vote in three municipal wards in the Nov. 18 city primary, and, contrary to public opinion, *Negroes outnumber white votes in only one of the wards,* R. F. Worley, chairman of the City Board of Registrars, revealed today.

Only in the Fifth Ward—where four candidates are seeking the post being vacated by incumbent—do Negroes outnumber whites, Mr. Worley's report showed. He listed the registrants as 913 white men and women and 1,010 Negroes in this ward.

Whites still outnumber Negroes in the Second Ward, where incumbent C. M. (Chet) Clark is unopposed for renomination. Mr. Worley advised. Registrants include 464 whites and 309 Negroes. Political observers had figured that Negroes would predominate in the Second.

The Third Ward, in which incumbent Charles M. Shackelford is opposed by R. A. (Bob) Culpepper, is overwhelmingly white, 791 to 61, the chairman advised.

All Time High

The total registration in these three wards already exceeds the total registration of all five city wards of prewar years. Thus registration for the entire city is at an all-time high.

Mr. Worley said that the total announced today were "subject to a few purges" because of citizens moving about from one ward to another, but that the corrected totals would not vary by 10 voters more or less in each ward.

Candidates lined up for the strenuous Fifth Ward race, now officially on with the closing of entries at noon Monday, include M. M. Hester, Edward J. Davis, H. E. Mangum and R. F. (Dick) Armstrong.

Negroes will vote for the first time in history in the city primary, hitherto restricted to whites only. The primary also will mark the third time Negroes have been eligible to cast ballots here in 1946, since they were permitted to vote in the county and state primaries earlier in the year. (emphasis added).

On November 7, 1946, the Albany Herald editorialized on Negro block voting (R. 270), and on November 18, 1946, the paper reported as follows:

## WEATHER CUTS INTO MUNICIPAL PRIMARY VOTE

Lowering clouds and a biting north wind took their toll of voters turning-out for today's municipal primary, in which three city commissioners will be nominated. Of 3,548 registered to cast ballots, only 209 had done so by mid-morning at five precincts in the Dougherty County courthouse and Municipal Auditorium.

Sad faced candidates, greeting ballot casters at the courthouse, were shaking their heads over the weather.

*Even the Negro vote, first on record in such a primary here, was light, a fact which puzzled observers who had expected a 100 per cent turnout with an early rush of the 1,380 Negro registrants; 1,010 of whom are in the Fifth Ward.* Only 286 Negroes had voted by early afternoon.

### One New Face

With the primary in progress, one new face on the City Commission was assured. The Fifth Ward incumbent, P. A. Keenan, did not choose to seek renomination, and four candidates are engaged in a battle royal for his seat, including M. M. Hester, agriculturalist; Edward J. Davis, insurance man; H. F. Mangum, retail grocer, and R. F. (Dick) Armstrong, former mayor and Fifth Ward Commissioner. Predictions as to the outcome of this race were few and far between, *although observers agreed that the candidate who corralled the Negro vote would win handily.*

Facing opposition for the first time in several years was Third Ward incumbent, C. M. Shackelford, seeking his seventh successful two-year term of office. His opponent is railroad engineer R. A. (Bob) Culpepper.

Only incumbent seeking renomination without opposition is the Second Ward's C. M. (Chet) Clark, who thus is assured his second full term of office.

All nominations will be ratified in the Dec. 2 general election.

By wards, the early afternoon vote was as follows: Courthouse—Fifth Ward, 175; Second Ward, 17; Third Ward, 116; Auditorium—Fifth Ward, 263; Second-Third Ward (combined), 23. (R. 271). (emphasis added).

That "the candidate who corralled the Negro votes would win handily" proved to be an accurate prediction.

The Democratic primary election for the City of Albany was held . . . for the commissioners representing the second, third and fifth wards. The stipulated facts show that 3,548 persons were registered to vote in that election and that by race and ward they were as follows:

| Race | Second Ward | Third Ward | Fifth Ward |
|------|-------------|-----------|-----------|
| White | 464 | 791 | 913 |
| Black | 309 | 61 | 1010 |

Blacks thus constituted more than a majority of the registered voters in the Fifth Ward.

The stipulated facts further show that in the Fifth Ward there were two whites (sic) candidates running for the nomination. Of the 1,923 voters, 353 white citizens voted and 448 Negro citizens voted—a total of 791—at what were then segregated polling places. Broken down by race those 791 votes were cast as follows:

### Candidates

| | Edward J. Davis | R. F. Armstrong |
|---|---|---|
| White voters | 156 | 197 |
| Black voters | 384 | 64 |
| Total | 540 | 261 |

The overwhelming majority of black voters cast their votes for Edward J. Davis and a substantial majority of white voters cast their votes for R. F. Armstrong. Edward J. Davis was elected. The impact of the votes of the new black voters is readily apparent from these figures.

*Paige v. Gray*, 399 F.Supp. 459, 460–62.

On January 30, 1947, the Albany Herald's editor took note of the Talmadge sponsored

white primary bill then being debated in the Georgia legislature.

It is patterned after a South Carolina law which prevents Negroes from participating in Democratic white primaries and that, of course, is the chief aim of the measure. Georgians had their first taste of so-called Negro "block voting" last year, and they didn't like it. . . . (R. 272).

By March 26 the already described 1947 Act amending Albany's city charter so as to provide for all seven commissioners to be elected at large had been passed and approved by the Governor.

The legislature did not prepare or publish a legislative history of the 1947 Act. It was not then nor is it now the custom in this state to prepare or publish legislative histories for either general or special laws enacted by the legislature.

The only direct evidence as to the purpose of changing to at-large elections was the testimony of an Albany attorney who then represented Dougherty County in the legislature and who stated that it was then the custom in the state legislature to introduce only those items of local city legislation which were unanimously supported by Albany's elected officials. He, in effect, denied that this change was enacted to deprive the new Negro voting majority in the Fifth Ward of its majority status. Instead he attributed the legislation to a desire to be rid of ward politics and of those who once elected thought only of their ward instead of the city as a whole. No one explained why it suddenly became necessary in 1947, Albany's twenty-sixth consecutive year of electing commissioners by wards, to get rid of ward politics.

Nothing explains why the March 26, 1947, Act did not become effective for the already scheduled 1947 elections for Mayor, Mayor Pro Tem and Commissioners from the First and Fourth Ward. It specifically became effective with the December 1948 elections thus leaving the First and Fourth Ward Commissioners to be elected by just their ward voters in 1947. Nothing further explains why the Act provides that "the Commissioner from the Fifth Ward shall continue in office until the second Monday in January, 1949, and until his successor is elected and qualified." 1947 Ga.Laws at 734. It could be that with new boundaries for each ward the incumbent just elected commissioner would not reside in the new Fifth Ward and a vacancy would be created.

As of the enactment of the said 1947 law no elected officials of the City of Albany was or as far as the court and the parties know, ever had been of the Negro race.

(C) *The General Facts.*

Albany was a typical small, racially segregated southern city with a majority white population in control of the public and private forces of the community.

The city of Albany governed then as now by its seven elected commissioners, was operated by a city manager chosen by the Board of Commissioners and given authority by the city's 1923 revised charter to be "the administrative head of the municipal government" and as such to hire and fire all municipal employees excepting those who by law are appointed or elected by the commissioners. 1923 Ga.Laws at 379. Albany afforded a full range of municipal services to its residents and in addition unlike most Georgia cities, also operated its own water, gas and light department.[7] This department obtained water from its own artesian wells, manufactured[8] its own gas, received electricity from Georgia Power Company and distributed these to Albanians. In the course of doing so that department paid for and maintained traffic con-

---

7. Albany's city charter as amended by 1901 Ga.Laws at 297 created a water and light commission for the city. By 1923 and the enactment of Albany's new charter that commission was called the water, gas and light commission.

8. Until around 1954 and the construction of a natural gas pipeline through Albany by South Georgia Natural Gas Company, Albany manufactured its own gas. Upon completion of the pipeline Albany started receiving and distributing natural gas.

trol lights and street lights throughout the city, paid for plant and equipment and in addition contributed to the city treasury as much as 30 to 40% of the city's gross annual revenue.[9] The water, gas and light department at least since 1923 has been operated by a board of water, gas and light[10] commissioners of which the mayor has always been a member and ex-officio chairman, 1923 Ga.Laws at 400, and of which there were initially two additional citizen members elected by the city commissioners. Today it consists of four additional citizen members elected by the city commissioners. All previous and present commissioners were white. The department was operated by a superintendent selected by the water, gas and light commission, and it functioned apart from the municipal services over which the city manager was the administrative head.

Albany's municipal services included among other things, police and fire departments, street construction and maintenance, garbage collection, parks, swimming pools, tennis courts, and a municipal auditorium. Other public facilities directly or indirectly controlled by the city and available to its citizens were an airport, a municipal library and a baseball-football stadium. There facilities were operated on a segregated basis.

Albany's children attended segregated public schools operated by the Board of Education of the City of Albany whose seven members were the Mayor, the Chairman of the County Commissioners, the President of the County Board of Education and four citizen members elected by Albany's city commissioners. 1925 Ga.Laws at 829. In 1950 the city and county schools were merged and put under the control of the Dougherty County Board of Education. Two of its seven members are selected by the city commissioners, two by the county commissioners, two by the grand jury of

Dougherty Superior Court, and one by the six so selected. See 1959 Ga.Laws at 2314. The members of the Board of Education through the filing of this lawsuit were all white.

While black citizens voted in primary and general elections, the officials who conducted those elections required all black voters to cast their ballots in one precinct at the city auditorium and all white voters to cast their ballots in other precincts at other places.

Albany created a public housing authority whose members appointed by the Mayor are white, and it constructed and operated large public housing projects, some for whites only and some for blacks only.

Like all southern cities and if the truth be told, like most areas of these United States having a substantial Negro population, Albany in every respect until the 1960's and later functioned governmentally and otherwise as a racially segregated community. As in the south in general segregation came to an end slowly and only when ordered by a federal court. That was particularly true in Albany as is demonstrated in detail by the cases involving Albany that have been commenced in this court, to wit:

Anderson v. Courson, et al., 203 F.Supp. 806 (Judge Bootle 1962)—This court on the basis of stipulated facts found that by the custom and practice of maintaining separate voting facilities for whites and blacks, maintaining voting lists separated by race and otherwise conducting elections on a segregated basis, the defendants, including the Mayor and Commissioners, were denying Negro voters the equal protection of the law. The continuation of such customs and practices was enjoined.

9. "The following figures are
 (1) the gross revenues of the city, and
 (2) the net profits of the water, gas and light commission paid by that department into the city treasury:

| | | (1) | | (2) | |
|---|---|---|---|---|---|
| 1970–71 | (1) | $ 5,236,058 | (2) | $ 2,062,000 | |
| 1971–72 | (1) | 6,192,883 | (2) | 2,329,999 | |
| 1972–73 | (1) | 7,640,940 | (2) | 2,702,275 | |
| 1973–74 | (1) | 8,932,469 | (2) | 2,724,960 | |
| 1974–75 | (1) | 9,472,116 | (2) | 2,980,681" | |

Johnson v. City of Albany, Ga., 413 F.Supp. 782 at 789 (D.C.1976).

10. Before 1923 Albany had a water and light commission. See 1901 Ga.Laws at 297.

*Anderson v. City of Albany,* 321 F.2d 649 (5th Cir. 1963)—On the basis of the complaint of the leader of the so-called "Albany Movement"—a group of black citizens bent upon ending segregation in all of Albany—alleging that defendant city officials were enforcing segregation of the races in public recreational, library and auditorium facilities and in privately owned transportation facilities, theatres and taxicabs and evidence presented before this court, the court of appeals directed this court to enjoin further operation of public facilities—such as ·public parks including recreational facilities such as tennis courts and swimming pools, the city library and the city auditorium, on a segregated by race basis and further enforcement of criminal segregation ordinances requiring segregated by the races operation of taxicabs, theatres, city buses and transportation facilities.

*Gaines v. Dougherty County Board of Education,* 222 F.Supp. 166 (Judge Elliott 1963). The operation of the public schools of Albany and Dougherty County on a segregated basis was enjoined on the basis of the Supreme Court's decision in *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). That litigation is still pending in this court and has resulted in numerous decisions of the court of appeals as recent as 1972. *See* 329 F.2d 823 (1964); 334 F.2d 983 (1964); 392 F.2d 669 (1968); 442 F.2d 1344 (1971); 446 F.2d 907 (1971); 465 F.2d 363 (1972).

*United States v. Housing Authority of the City of Albany,* Civil No. 10007—January 16, 1973, Judge Elliott—In an unpublished opinion the continued racially discriminatory operation of Albany's eight public housing projects, was enjoined. Among the court's findings was that of the eight projects, four were constructed for whites only and four for blacks only; as of 1973 no black had ever been a tenant in a white only project and no white had ever been a tenant in a black only project.

*Thompson v. Sheppard,* 490 F.2d 830, *rehearing denied* 502 F.2d 1389 (5th Cir. 1974), *cert. denied* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666—The court of appeals affirmed this judge's order finding the jury box from which petit and grand jurors (two board of education members are selected by the grand jury) were being selected for Dougherty Superior Court, to be constitutionally deficient because of a shortage of the names of women and blacks in the box and this court's further order that as revised the box was constitutionally sufficient.

*Johnson v. City of Albany,* 413 F.Supp. 782 (Judge Owens 1976). As shown by detailed facts recited in that opinion this judge found:

"(a) In 1968 the City of Albany and its defendant officials employed both white and black persons. Compared to the practices as to white persons, black persons were hired into and then held only the lowest paying, laboring—janitorial, non-supervisory type jobs. Higher paying, more skilled jobs were for whites only. The rate of pay of black employees was less than white persons having comparable tasks to perform. Black persons were not permitted to apply for promotions and were not promoted out of such jobs. All elected and appointed city officials and supervisors were of the white race. Employee facilities—restroom, drinking fountains, coffee pots, etc.—were segregated by race. Employee functions such as Christmas parties were segregated. From an overall standpoint in every respect white employees and applicants for employment were favored over black employees and applicants for employment.

"(b) Between 1968 and early 1973, in spite of Congress amending Title VII to subject the City of Albany to its provisions, the April 19, 1972, strike of black employees and the August 31, 1972, commencement of the lawsuit, the employment patterns and practices

of the City of Albany and its defendant officials showed little if any change. Pay differentials between blacks and whites having the same jobs were being or had been corrected. Blacks, however, still were hired into and had only the lowest paying, laborer-janitorial, non-supervisory type jobs. Only whites were considered for and had higher paying, more skilled jobs. All elected and appointed city officials and all supervisory officials were white. Blacks could not apply for, were not considered for and were not promoted into more skilled, better paying jobs. Employment application forms and tests were used not to measure job aptitude but instead to give the false appearance of fairly considering all persons for employment and promotion and to perpetuate the past but continuing discriminatory practices. Promotions were made from within departments thus perpetuating the conditions of the past. Employment facilities were still segregated. Since these were the employment patterns and practices in 1973, the same patterns and practices had existed (i) on and after March 24, 1972, when the City of Albany became subject to 42 U.S.C. § 2000e, (ii) on April 24, 1972, when charges of employment discrimination were filed with EEOC in behalf of five of the named plaintiffs and (iii) on August 31, 1972, when the plaintiffs filed their complaint in this court.

"(c) As of the end of 1975 the City of Albany and its defendant officials have altered their employment patterns and practices in some respects. Compared to 1973 the Water, Gas and Light department employed 18 fewer blacks. Of the 35 blacks then employed, two had been promoted to foreman and six had been added to the administrative department which before 1972 was a white only department. Blacks however had not progressed to higher paying jobs except for two foremen who were earning $5.25 and $5.57 per hour. Employee facilities had been desegregated and segregated employee gatherings were eliminated. The management-supervisory team, however, remained all white and the basic pattern of favoring whites over blacks continued. In other departments blacks were hired or promoted into 25 classifications in which they had not been employed. Some blacks—45—were being paid higher wages—over $4.00—but whites still dominated jobs paying higher wages. Three hundred four (304) whites were paid over $4.00 per hour. Application forms and tests were being used. Hiring and promotional decisions were still being made by an all-white management-supervisory team. As the initial hire chart shows most blacks—108 of 158—were still hired as laborers, and as the line of progression chart shows, blacks are still with few exceptions kept in lower-paying, blue-collar, non-supervisory jobs. While the pattern and practice of discriminating against blacks has lessened, it nevertheless continues to the present day." 413 F.Supp. at 799, 800.

Even though blacks were permitted in 1946 after *Chapman v. King, supra,* to participate in Democratic primary city elections as voters and candidates, the Democratic Party for the City of Albany remained in the hands of an all-white committee which re-elected itself after counting the votes at each election. The first black committee member was elected by the committee in May 1975. In this court's judgment it was not even organized according to the laws of Georgia, Ga.Code Ann. § 34A–801 and 802, in that it had not filed with the city clerk its charter, by-laws, rules and regulations. When filed, such items are available to the public, and when not filed, the public has no way to know how and when party officials are elected. The effect of this is shown by the fact that at the time of the death of Mayor Motie Wiggins in 1973 he was then the nominee of the Democratic primary election to succeed himself as mayor. Even though the compliance of the Democratic Party with Code

§ 34A–801 and 802 was questioned and even though they had not qualified under those sections, Albany's city commission all of whose remaining members were white nevertheless met, determined the Democratic Party to be qualified under state law and permitted the Democratic Party composed of its self-perpetuating all white committee, to nominate a candidate to run in the place of the late Mayor Wiggins. Defendant Mayor Gray was thus nominated.

Blacks between 1947 and August 1975 ran as candidates in city primary and general elections. They usually received a majority of the votes in the ward in which they resided but were never elected by the majority of the voters of the city. Since 1959 Ga.Laws at 2950, a majority vote requirement had been imposed in Albany's primary and general elections. Only after elections were ordered held in the fall of 1975 on a ward basis were black candidates successful in seeking an elected city official—two were elected as commissioners by the voters of their respective wards in each of which there is a black majority.

Either all the city commissioners or the mayor alone appoints members of various boards and authorities some of which have been referred to—Board of Education; Water, Gas and Light Commission—and to whom authority to perform certain governmental function is delegated. At the court's request the defendants prepared the following list by race of persons appointed to boards and authorities as of the beginning of this lawsuit:

BOARDS AND AUTHORITIES AS OF DECEMBER 4, 1974 APPOINTED BY MAYOR OR CITY COMMISSION

| NAME OF BOARD OF AUTHORITY | MEMBERSHIP WHITE | BLACK | TOTAL |
|---|---|---|---|
| *Albany Metropolitan Planning Commission | 8 | 1 | 9 |
| Albany Planning Commission | 8 | 2 | 10 |
| Animal Control | 7 | 0 | 7 |
| Aviation Commission | 7 | 0 | 7 |
| Albany Chehaw Wild Animal Park Advisory Board | 9 | 0 | 9 |
| Board of Education | 5 | 2 | 7 |
| Board of Registrars | 2 | 1 | 3 |
| Central Albany Development Authority | 5 | 0 | 5 |
| *Citizens Advisory Committee | 84 | 16 | 100 |
| Electrical Board | 8 | 0 | 8 |
| Gas Board | 5 | 0 | 5 |
| Housing Authority | 4 | 1 | 5 |
| Heating & Air Conditioning Board | 6 | 0 | 6 |
| Library Board | 7 | 0 | 7 |
| Minimum Housing Board | 5 | 0 | 5 |
| Payroll Development Authority | 5 | 0 | 5 |
| Pension Board | 5 | 0 | 5 |
| Plumbing Board | 5 | 0 | 5 |
| Southwest Ga Area Planning & Development Commission | 26 | 9 | 35 |
| Steering Committee for Naval Air Station | 11 | 3 | 14 |
| Street Name Change Committee | 10 | 0 | 10 |
| Stadium Authority | 7 | 0 | 7 |
| *Recreation Advisory Committee | 5 | 3 | 8 |
| Transportation Committee | 6 | 1 | 7 |
| Water, Gas & Light Commission | 5 | 0 | 5 |
| Zoning Board of Appeals | 5 | 0 | 5 |
| Totals | 260 | 39 | 299 |

* Joint Appointment (City & County)

This list includes 26 boards or authorities, 16 of which had no black appointees. The total number of black appointees is 39 and 25 of those are on the Citizens Advisory Committee and the Southwest Georgia Area Planning and Development Commission. Overall blacks constitute 13% of those appointed. While the function of each board or authority has not been explored, two committees on which 19 blacks serve appear to be purely advisory and therefore without means of causing anything to be done to affect black citizens—Citizens Advisory Committee and Recreation Advisory Committee.

Albany's city commission since around 1972 has endeavored to spend recreation and public works money for the benefit of

all citizens so that today citizens generally enjoy an available recreation program, paved streets, sewers, street lights and public utilities. As the 1970 census shows in great detail,[11] in all other areas—education, housing, employment, income—black Albany citizens continue to have substantially less than white citizens.

## THE CONSTITUTION AND LAWS APPLIED TO THE FACTS

*Equal Protection—Fourteenth Amendment Claim.*

As previously indicated, the Supreme Court said in *White v. Regester,* 412 U.S. at 765, 93 S.Ct. at 2339.

"Plainly, under our cases, multimember districts are not per se unconstitutional . . . But we have entertained claims that multimember districts are being used invidiously [12] to cancel out or minimize the voting strength of racial groups . . . To sustain such claims, it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice. *Whitcomb v. Chavis,* supra, at 149–150, [91 S.Ct. at 1872], 29 L.Ed.2d 363."

Having considered all the facts as found and recited and as heretofore found in the cited decisions of this court, it is the considered judgment of this court that the plaintiffs have carried their burden of proof and have factually proven that Albany's multi-member scheme of electing its city commissioners, as it has functioned has been invidiously discriminatory against the black citizens of Albany.

Albany's change in 1947 from ward to at-large election of its five ward commissioners created a system in which Albany's white voting majority had the opportunity and the potential voting strength to elect not only Albany's mayor and mayor pro tem but also the remaining five ward commissioners. Each voter thus was given the right to vote for more than one commissioner—to vote for multimembers. The majority of voters were given the opportunity to win all the elections—the "winner take all" characteristic being one of the basic criticisms of a multi-member scheme.[13]

After 1947 in every primary and general election preceding this lawsuit, the white candidate was elected. Those included elections in which black candidates ran and received a majority of the votes in their ward but a minority of the votes city-wide.

In addition to this lack of success at the polls which is not enough by itself to demonstrate that the system invidiously discriminated against blacks, *White v. Regester, supra,* Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363, the elected city commissioners in conducting the affairs of the city directly and indirectly discriminated against this racial minority—directly through their own policies of employment discrimination and enforcement of segregation policies and practices in both public and private facilities and indirectly by appointing only white citizens to boards and authorities which in turn discriminated against blacks—particularly the water, gas and light commission; board of education; and public housing authority.

Through the multi-member system and the conduct of Albany's elected officials the black community has just never had the opportunity or been permitted to enter into the political process of electing city commissioners and operating Albany's municipal government, in a reliable and meaningful manner. It is therefore violative of the Equal Protection Clause of the Fourteenth

---

11. Note in particular Tables 40 and 89 through 95, Vol. 1, *Characteristics of the Population.*

12. See n. 4, *supra.*

13. See n. 5, *supra.*

Amendment and unconstitutional under the standards enunciated by the Supreme Court of the United States.

*Fifteenth Amendment Claim.*

In its August 16, 1975 opinion, this court sustained plaintiffs' Fifteenth Amendment claim saying:

"The Fifteenth Amendment to the Constitution of the United States provides:

" 'Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.'

"[2] To prove that the right to vote has been denied or abridged on account of race or color in violation of the Fifteenth Amendment, the plaintiffs are not required to establish by evidence that the individual persons who caused this 1947 law to be enacted—the legislators, the then Mayor, Mayor Pro Tem and City Commissioners 'etc'—devised it for the express purpose of denying or abridging the right of Negro citizens of Albany to vote or that they specifically intended for this law to result in a denial or an abridgement of the right of Negro citizens to vote. Instead, as the Supreme Court of the United States on November 14, 1960, in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (an Alabama case challenging the constitutionality of an act of the Alabama legislature which redefined the boundaries of Tuskegee, Alabama, so as to exclude all but 4 or 5 of Tuskegee's 400 Negro voters) has already decided, plaintiffs are only required to demonstrate that this 1947 act changing Albany's method of electing city commissioners has the inevitable effect of depriving Negro citizens of their votes and of the consequent advantages that the ballot affords them. "As the Supreme Court said in *Gomillion v. Lightfoot, supra* :

'When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. . . .' 364 U.S. at 347, 81 S.Ct. at 130, 5 L.Ed.2d at 117.

\* \* \* \* \* \*

'. . . Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution. . . .' 364 U.S. at 344, 81 S.Ct. at 129, 5 L.Ed.2d at 115.

\* \* \* \* \* \*

'It is difficult to appreciate what stands in the way of adjudging a statute *having this inevitable effect* invalid in light of the principles by which this Court must judge, and uniformly has judged, statutes that, however speciously defined, obviously discriminate against colored citizens. "The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287.' 364 U.S. at 342, 81 S.Ct. at 127, 5 L.Ed.2d at 113 (emphasis added).

"For this trial court it is likewise difficult to appreciate what stands in the way of adjudging this 1947 act having the inevitable effect of reducing Negro voters residing in one of five wards of Albany—one-fifth of Albany's entire population—from a majority to a minority status, invalid in light of the Fifteenth Amendment as it plainly reads and as applied by the Supreme Court in *Gomillion, supra.*

"[3] The evidence as already recited demonstrates that the 1947 act of the Georgia legislature which eliminated the election of Albany's five commissioners by just the voters of each respective ward, reduced the Negro voters of the Fifth Ward from a majority of the total registered voters status to a minority of the total registered voters status. This deprived them of the opportunity they theretofore possessed and had used on November 18, 1946, to combine votes and cause the election of the candidate of their choice. This is the inevitable effect

of this statute. As such it obviously had the effect of denying or abridging the right of Negro citizens of Albany to vote on account of their race. This contravenes the Fifteenth Amendment and makes the 1947 act unconstitutional." 399 F.Supp. at 463–464.

On appeal the Fifth Circuit Court of Appeals stated:

"Notwithstanding *Gomillion's* 'inevitable effect' language, it is likely that the Supreme Court will require circumstantial proof of unlawful motive. See *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Thus absent an express finding of discriminatory purpose, the application of *Gomillion* to the assessment of an at-large election plan's validity may be incomplete. Since we conclude that any evaluation of the 1947 law should be made more recent and less ambiguous precedents, we do not reach the question of whether the sequence of events leading passage of the 1947 Act was sufficiently suspect to compel a finding of racial motivation." 538 F.2d at 1110.

 With due respect to the judges of the court of appeals, this court's research does not indicate that the Supreme Court has in any way modified or lessened its "inevitable effect" language. This court's research also does not indicate that an express finding of discriminatory purpose is or will be required by the Supreme Court to establish a Fifteenth Amendment claim. Note the concurring opinion of Mr. Justice Stevens in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597—the case cited in the just quoted portion of the Fifth Circuit opinion in this case on appeal:

"The requirement of purposeful discrimination is a common thread running through the cases summarized in Part II. These cases include criminal convictions which were set aside because blacks were excluded from the grand jury, a reapportionment case in which political boundaries were obviously influenced to some extent by racial considerations, a school desegregation case, and a case involving the unequal administration of an ordinance purporting to prohibit the operation of laundries in frame buildings. Although it may be proper to use the same language to describe the constitutional claim in each of these contexts, the burden of proving a prima facie case may well involve differing evidentiary considerations. The extent of deference that one pays to the trial court's determination of the factual issue, and indeed, the extent to which one characterizes the intent issue as a question of fact or a question of law, will vary in different contexts.

"Frequently *the most probative evidence of intent will be objective evidence of what actually happened* rather than evidence describing the subjective state of mind of the actor. For *normally the actor is presumed to have intended the natural consequences of his deeds.* This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decision making, and of mixed motivation. *It is unrealistic*, on the one hand, *to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker* or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it.

"My point in making this observation is to suggest that the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume. I agree, of course, that a constitutional issue does not arise every time some disproportionate impact is shown. *On the other hand, when the disproportion is as dramatic as in Gomillion v. Lightfoot*, 364 U.S. 339 [81 S.Ct. 125], 5 L.Ed.2d 110, or *Yick Wo v. Hopkins*, 118 U.S. 356, [6 S.Ct. 1064], 30 L.Ed. 220, it really does not matter whether the standard is phrased in terms of purpose or effect." *Id.* at 253–254, 96 S.Ct. at 2054. (emphasis added).

That case concerned a claim that a written personnel test given to prospective police recruits in the District of Columbia, discriminated against black applicants in violation of their right to due process and equal protection from the federal government. It did not involve a Fifteenth Amendment claim and does not purport to establish any standard of proof for such claims.

■ If this court were required to make a finding of intent, it would base such a finding upon all the circumstances surrounding the enactment of the 1947 legislation changing from ward to at-large elections and would have to conclude that the legislation was enacted for the purpose of abridging the right of Negro voters of Albany to vote in primary and general elections. The recited facts would simply permit no other conclusion.[14]

An express finding of discriminatory intent or racial motivation not being required by *Gomillion*, it is still this court's considered opinion that the 1947 act changing from ward to at-large elections had the "inevitable effect" of denying and abridging plaintiffs' Fifteenth Amendment Rights. That act and so much of Albany's charter as was amended—at-large election of its five ward commissioners—is therefore also unconstitutional because of violation of the Fifteenth Amendment.

### THE REMEDY

#### On Fifteenth Amendment Grounds

This court's original finding that Albany's 1947 charter amendment had the inevitable effect of abridging the Fifteenth Amendment protected right of Albany Negroes to vote, resulted in a declaration that the 1947 amendment was and is unconstitutional. That amendment concerned only Albany's five ward commissioners and a change only in the manner of their election—from single-member wards to at-large. Albany's mayor and mayor pro tem were not affected by the 1947 law; they continued as they had for years, to be elected at large. That declaration of unconstitutionality had the practical effect of removing so much of that 1947 law as provided for a change to at-large elections, from the statute books. With the 1947 law so removed Albany was left with its charter as it had been before 1947—a mayor and mayor pro tem elected at large and five commissioners each elected by just the voters of each of five wards. This court did not devise or create that scheme; it simply resulted from the court eliminating the 1947 amendment from the statute books.

With the 1947 amendment gone and five commissioners to be elected from single-member wards—as they had been from 1921 until 1947—the court was called upon to redraw Albany's five wards to remedy the mal-apportionment that as a consequence[15] existed. The court did this and also ordered necessary changes in election procedure to immediately implement its order. The system of electing Albany's city officials as ordered by this court is thus a court ordered plan only to the extent that this court found the 1947 amendment unconstitutional which resulted in the pre-1947 act being in use and that this court reapportioned Albany's five wards. The plan itself had been enacted by the legislature of this State in 1923 and amended in 1937. As such the plan represented the

---

**14.** As the Fifth Circuit Court of Appeals *en banc* stated in *Kirksey v. Board of Supervisors of Hinds County, Miss.*, 554 F.2d 139 (1977):

"The pattern is clear and stark, and is unexplainable on any grounds other than race.[11a]

11a [Footnote in text] See discussion *infra* of indicia of motive and intent set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)." *Id.* at 144.

It would be disingenuous to even suggest that this . . . sprang from benign or neutral motives.

**15.** Absent a constitutional defect, residential districts in which at-large candidates are required to reside, do not have to comply with the "one-man, one-vote" rule. Had neither constitutional defect been found in this case, Albany's wards which were used only for residential requirements may not have been subject to the "one-man, one-vote" rule. See *Dusch v. Davis*, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967).

previous judgment of the State of Georgia as to Albany's municipal government structure.

 The validity of the court's August 1975 reapportionment remains unchallenged and likewise in the court's best judgment remains the appropriate remedy for the Fifteenth Amendment violations found in August 1975 and in this opinion reaffirmed.

*On Fourteenth Amendment Grounds*

The court's declaration that petitioner's Equal Protection rights have also been violated is not a finding that Albany's charter as revised by this State's legislature in 1923 and amended in 1937 and 1947 was an unconstitutional law when revised or amended. It is a finding that Albany's election system because it has operated and functioned in a racially discriminatory fashion, has denied Negro citizens their constitutional right to fully and fairly participate in the political process as the Equal Protection Clause assures. This finding requires this court to determine a remedy that will ensure Negro citizens the opportunity to fully and fairly participate in Albany's political process.

 In devising such a remedy United States district courts do so in the exercise of their traditional equitable judicial power. The courts frequently refer to the process as an exercise of the court's "equitable discretion". *Connor v. Finch,* 431 U.S. 407, 421, 97 S.Ct. 1828, 1837, 52 L.Ed.2d 465, 473 (1977).

 In ensuring the representation of minority interests the Supreme Court has stated that district courts should not "intrude upon state policy any more than necessary." *Whitcomb v. Chavis,* 403 U.S. at 160, 91 S.Ct. at 1878, 29 L.Ed.2d at 386. State policy if (1) it is long-standing and free of constitutional defects in its origin, (2) is rationally mandated by significant and important state considerations, and (3) it does not perpetuate the invidious discrimination that is to be cured, should be respected and deferred to by the district court. *See Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Perry v. City of Opelousas,* 515 F.2d 639 (5th Cir. 1975), and *Kirksey v. Board of Supervisors of Hinds County,* Miss., 554 F.2d 139, *en banc* (5th Cir. 1977). This is because publicly elected state legislators are in better position than appointed for life federal judges to make political judgments.

There are no specific rules which tell district judges who "are unable to avoid deciding any particular case submitted to them" *Id.* at 159, how to exercise the terrible discretion that is theirs. They learn only by being told from time to time that they abused that discretion. The difficulty is that viewed realistically the exercise of equitable discretion requires an individual United States District Judge to determine what he perceives to be a fair solution to a racial problem—fair to both the racial minority and the racial majority. It is an exercise in human judicial judgment. Only after a district judge makes his decision and only after an appeal is taken, does the district judge learn whether or not three (and occasionally fifteen) judges of the court of appeals and/or nine justices of the Supreme Court agree or disagree with his exercise of his judicial discretion. When there is disagreement in cases such as this it seems to this court that the specific basis for that disagreement is difficult, if not impossible to discern. Mr. Justice Harlan's opinion in *Whitcomb v. Chavis, supra,* 403 U.S. at 165, 91 S.Ct. at 1881, 29 L.Ed.2d at 388. *See* Circuit Judge Hill's dissent in *Kirksey, supra,* at 159; the prospective discussion of remedy by Circuit Judges Clark and Ainsworth in this case on appeal, 538 F.2d 1108, and *Lipscomb v. Wise,* 551 F.2d 1043 (5th Cir. 1977). These difficulties though foreseen by individual Justices of the Supreme Court, continue unabated. *See* Mr. Justice Frankfurter's dissent in *Baker v. Carr,* 369 U.S. at 266, 82 S.Ct. 691, 7 L.Ed.2d at 714.

 When a district judge finds it necessary to depart from the plan that was adopted by the legislative body to remedy

an equal protection constitutional violation, to the extent that the court departs and to the extent that the court finds it necessary to devise its own plan, the Supreme Court has repeatedly in various cases and in similar but different language enunciated " . . . the rule that when United States District courts are put to the task of fashioning reapportionment plans to supplant concededly invalid state legislation, single-member districts are to be preferred absent unusual circumstances. *Chapman v. Meier,* 420 U.S. 1, 17–19, 95 S.Ct. 751, 761–762, 42 L.Ed.2d 766, 778–780 (1975); *Mahan v. Howell,* 410 U.S. 315, 333, 93 S.Ct. 979, 989, 35 L.Ed.2d 320, 335 (1973); *Connor v. Williams,* 404 U.S. 549, 551, 92 S.Ct. 656, 658, 30 L.Ed.2d 704, 707 (1972); *Connor v. Johnson,* supra, 402 U.S. at 692, 91 S.Ct. [1760] at 1762, 29 L.Ed.2d [268] at 271." 424 U.S. at 639, 96 S.Ct. at 1085, 47 L.Ed.2d at 299. "Unusual circumstances" is synonymous with "special circumstances" and "persuasive justification", but neither term has been more specifically defined. *Connor v. Finch, supra.*

The Supreme Court in passing upon the validity of reapportionment plans created by a state legislature has consistently deferred to that plan as long as it is in accordance with federal constitutional standards. As the Supreme Court said in 1972:

"We need not review at length the several pronouncements of this Court relating to state legislative reapportionment. The pertinent cases, particularly those of June 15, 1964, and the guidelines they provide are well-known. It suffices to note that in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, the Court stated that apportionment 'is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites . . . ' 377 U.S. at 586, [84 S.Ct. at 1394], 12 L.Ed.2d at 541. But we also stated, 'With respect to the operation of the Equal Protection Clause, it makes no difference whether a State's apportionment scheme is embodied in its constitution or

in statutory provisions,' and, then, 'Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible.' 377 U.S. at 584 [84 S.Ct. at 1393], 12 L.Ed.2d at 540." *Minnesota State Senate v. Benns,* 406 U.S. 187 at 196, 92 S.Ct. 1477 at 1483, 32 L.Ed.2d 1 at 9–10.

On the other hand in judging a plan or so much of a plan as is created by a district court, the Supreme Court holds the district court in accomplishing its task to a standard that is stricter than the standard imposed upon state legislatures. As the Supreme Court stated on May 31, 1977, in *Connor v. Finch, supra* :

"Although every state reapportionment plan is fraught with its own peculiar factual difficulties, it can hardly be said that this Court has given no guidance of general applicability to a court confronted with the need to devise a legislative reapportionment plan when the state legislature has failed. We have made clear that in two important respects a court will be held to stricter standards in accomplishing its task than will a state legislature: '[U]nless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than de minimis variation.' *Chapman v. Meier,* 420 U.S. 1, 26–27, [95 S.Ct. 751, 766] 42 L.Ed.2d 766.

"These high standards reflect the unusual position of federal courts as draftsmen of reapportionment plans. We have repeatedly emphasized that 'legislative reapportionment is primarily a matter for legislative consideration and determination,' *Reynolds v. Sims,* 377 U.S., at 586, [84 S.Ct. [1362] at 1394, 12 L.Ed.2d 506] for a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality. The federal courts by contrast

possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name. In the wake of a legislature's failure constitutionally to reconcile these conflicting state and federal goals, however, a federal court is left with the unwelcome obligation of performing in the legislature's stead, while lacking the political authoritativeness that the legislature can bring to the task. In such circumstances, the court's task is inevitably an exposed and sensitive one that must be accomplished circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.' *Roman v. Sincock,* 377 U.S. 695, 710, [84 S.Ct. 1449, 1458], 12 L.Ed.2d 620." 431 U.S. at 414, 97 S.Ct. at 1833, 52 L.Ed.2d at 473–474.

That the term "state reapportionment plan" as used by the Supreme Court encompasses not only state legislative plans for the election of members of the state legislature but also state legislative plans for the election of members of a county and municipal governing body and of a local school board, is shown by an examination of the facts of *East Carroll Parish School Board v. Marshall, supra.* The election plans there under consideration were those created by Louisiana's legislature for the police jury, the governing body of the parish—elsewhere generally called a county—and for the school board. It is also shown by the fact that the Supreme Court directed the Fifth Circuit Court of Appeals to apply its holding in *East Carroll Parish School Board v. Marshall,* to *Wallace v. House,* 515 F.2d 619, which involved a Louisiana municipal governing body election plan. 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976).

As difficult as the task is and as few as the guideposts are, it is nevertheless the responsibility of this court to fashion an appropriate remedy.

### Albany's Five Ward Commissioners

█ Even if there were no Fifteenth Amendment violation resulting in the 1947 amendment being unconstitutional and causing a reversion to ward elections, common sense, fundamental fairness would require that Albany's scheme of electing five ward commissioners at large be altered to provide for them to be elected from single-member wards. Without at least that departure from the past, Albany's racial minority because of the demonstrated propensity of the white majority to vote only for white candidates and because of the majority vote requirement [16] in Albany elections, would continue to be without access to the political process. They would continue to be without a voice in the legislative body in which decisions are made in Albany. The constitutional evils of the past would most likely continue. Remedially therefore on account of both the Fifteenth and Fourteenth Amendment violations single-member ward elections for Albany's five ward commissioners are required.

### Albany's Mayor Pro Tem.

There was no such office as that of Mayor Pro Tem until 1937 when Albany's charter was amended to designate one of its two at-large commission posts as mayor pro tem; that charter amendment specified no duties or responsibilities for this office. 1937 Ga.Laws at 1475–76.

While the commonly used term "pro tem" is an abbreviation of the Latin words *pro tempore* which means "for the time being; temporarily; provisionally" (Black's Law Dictionary, Rev. 4th Ed.), and while it can therefore be assumed that the legislature intended this newly titled official to act in the Mayor's absence, the court as to the period 1937 to 1949 has nothing but assumption to go on. The period of assumption ends in 1949 because in that year for the first time the duties of the mayor pro tem were legislatively specified. Even then the charter was amended to say only: "Whenever from any cause the Mayor shall be absent, the Mayor pro tem. shall act. The Mayor pro tem. shall have a voice in all proceedings before the Board, and shall have a vote in each and all matters whatso-

**16.** 1959 Ga.Laws at 2950.

ever." 1949 Ga.Laws at 117. It has not been further amended.

While this charter scheme creates no meaningful difference—he's only a "pinch-hitter"—between the commissioner who is mayor pro tem and the five ward commissioners, the evidence shows that as the system has actually functioned the mayor pro tem has had not much more to do than have the five ward commissioners. In the mayor's absence he generally appears at civic club meetings to make speeches and on ceremonial occasions to cut ribbons and act as the city's goodwill ambassador. As a ward commissioner who resigned and was running for mayor pro tem in 1975 testified, "[I]t's a little more prestigious and not any more work than I'm doing now . . . I'm a full time commissioner." Deposition of Harry Goldstein at 4. Mr. Goldstein was elected and after serving a year testified that during that year he had not had occasion on account of the mayor being absent, to make appointments of commissioners to standing committees; participate as a member of the Water, Gas and Light Commission; or preside over a meeting of the city commission. Deposition of Harry Goldstein, November 22, 1976, at 22. He also has signed checks, cut ribbons and met with out of town delegations in the mayor's absence. Depositions of past Mayor Pro Tem Proctor Johnston, Jr. and Buford Collins are to the same effect except that on occasion they did preside at commission meetings, they with regularity presided at Recorder's Court for the Recorder and each acted for a short time as Mayor on account of the death of a mayor.

The evidence does not indicate that the Mayor Pro Tem except when acting as Mayor because of the death of a Mayor, is ever regarded as an official who represents and makes decisions for the entire city. As a "pinch hitter" his services are seldom needed or used. He, therefore, as the incumbent suggests is in reality one who does no more than his fellow ward commissioners but on account of the title of the office is thought of as being more important, having more prestige than ward commissioners.

The mayor pro tem as these facts show is in reality one of Albany's city commissioners having powers, privileges and responsibilities identical to those of Albany's five ward commissioners and also having the power and responsibility of acting for the mayor in the mayor's absence. These powers and responsibilities being seldom used, the mayor pro tem except in name is virtually identical to the five ward commissioners. No special, unusual circumstances or persuasive justification for the contribution of the at-large, multi-member district election of this commission is shown by the facts heretofore recited. There is no other possible basis for the mayor pro tem to continue to be elected from a multi-member district. The commission post that was designated mayor pro tem must also be elected from a single-member district.

## THE MAYOR

### (a) *Charter Powers*

The office of Mayor of Albany was first created in 1841—just three years after Albany's first charter was enacted by this State's legislature. Albany then had a mayor and six councilmen, all elected at-large. The mayor was given no specific charter duties or power other than that of all councilmen. 1841 Ga.Laws at 52.

In 1858 the mayor was given judicial power to preside at police court and the power to impose fines and sentences. 1858 Ga.Laws at 127.

Following the mayor and councilmen being given the responsibility of electing a newly created board of police commissioners, 1890 Ga.Laws at 431, the mayor became the ex officio president of that board and was entrusted with power to call upon the police to enforce the city's laws. 1898 Ga.Laws at 118.

The charter power to "erect or authorize or prohibit the erection of electric lights, gas works, or water works" was granted by the legislature in 1889 and a Board of Water Commissioners elected by mayor and council was provided for in 1892. 1889 Ga.Laws at 186; 1892 Ga.Laws at 129.

The year 1899 brought a revised charter providing for a mayor and six councilmen elected at-large; a mayor pro tem elected by mayor and council; enumerated powers for the mayor; and a Board of Water and Electric Light Commissioners of which the mayor was ex-officio chairman and a voting member. There were two other utility commission members who at first were councilmen and shortly thereafter were two citizens selected by mayor and council. 1899 Ga.Laws at 116; 1901 Ga.Laws at 297.

The powers enumerated for the mayor in 1899 were:

"The mayor shall be the presiding officer of the council and shall be entitled to a vote upon any question before said body, but shall only exercise such privilege in case of a tie . . . In addition the mayor shall be the supreme executive officer of the city government, shall see to it that all laws, ordinances and resolutions are properly executed, shall see to it that all officers of the city properly perform their duties and shall in all things exercise a general supervision of the city's affairs, making such recommendations to the council, from time to time, as may to him seem proper for the public good."

He also continued as ex officio president of the Board of Police Commissioners and as presiding officer of police court. 1899 Ga. Laws at 107.

The mayor's office and duties remained unchanged until 1922 when the mayor and councilmen were legislatively replaced by a Board of City Commissioners whose five members selected their own chairman who acted as ex-officio mayor for ceremonial purposes.

One year later the charter was again changed by a complete revision. 1923 Ga. Laws at 370. While Albany's government consisted of five single-member wards and two at-large elected commissioners—all elected for two year terms—the commissioners elected one of their members as mayor to serve only a one year term. The duties of the mayor were in addition to his commissioner duties and were specified as follows:

"The mayor shall preside at all meetings of the commission and perform such other duties consistent with the office as may be imposed upon it, and shall have a vote and voice in all proceedings before the board, but no veto. The mayor may use the title of mayor in any case in which the execution of legal instruments of writing or other necessity arising where the general laws of the State, or former laws and ordinances of the City of Albany, not conflicting with this Act, so require it. In case of absence, death, sickness or disability from any cause, the mayor shall be unable to act, then any other member of the board may by the other members be designated to act and such appointee shall have all the powers and privileges of the mayor. The mayor shall be recognized as the official head of the city by the courts for the purposes of service of process and by the Governor and Federal authorities for military and ceremonial functions. In time of danger or emergency the mayor may, with consent of two commissioners, take command of the police and govern. the city by proclamation and maintain order and enforce laws."

1923 Ga.Laws at 376. The mayor's salary was a maximum of $1,200 compared to a $600 maximum for the other six commissioners. The mayor was not a full time employee or official; the daily running of the city was the responsibility of a city manager chosen by the board of seven commissioners.

Further, under the 1923 charter the mayor's consent was required for the marshal or chief of police for emergencies to employ additional police. The mayor if no city recorder was appointed, presided over city police court. He continued to be ex-officio chairman and one of three members of the board of water, gas and light commissioners; the other two members were still citizen members selected by the city commissioners. Citizen members could be removed from office but there is no provision for removing the mayor as ex-officio chairman and member. 1923 Ga.Laws at 404.

After 1923 the mayor's manner of selection and powers and responsibilities continued as they were until the legislature amended the charter in 1937 to provide that one of Albany's at-large commission posts would be designated as that of mayor and as mentioned already, the other as mayor pro tem.

From 1937 until now—as from 1841 until 1922—Albany's mayor has been elected at large by all of Albany's citizens and his powers and responsibilities as set forth in Albany's charter have remained virtually the same except that by general state law the mayor, like the mayor of all Georgia cities, appoints all of the five members of Albany's public housing authority. 1933 Ga.Code Ann. § 99–1110.

(b) *Actual Practices of Albany's Mayors*

The deposition testimony shows that in addition to being recognized in the charter as "the official head of the city by the courts for the purposes of service of process and by the Governor and Federal authorities for military and ceremonial functions" 1923 Ga.Laws at 377, the Mayor is looked upon as the leader of and spokesman for the city. He is generally regarded by Albanians as "our Mayor" (Deposition of Proctor Johnston, Jr., p. 8), and the city's leader. The position itself is prestigious. As such the mayor is furnished an office in Albany's city/county government building, but Albany's other commissioners are not.

As Albany has grown Albany's mayors have been required to devote substantially more time to their duties and in particular have been the city official with whom industrial prospects have spent much time. Albany's population growth is largely attributable to new industry located in Albany. As Albany's City Manager Steve Roos indicated in his testimony, the office of mayor functions as the center of city activities. It is a place of central leadership which affords an opportunity for the person occupying the office to ceremonially represent the city, communicate for and in behalf of the city and persuade others to programs and policies deemed to be for the good of all. Equally as important to all of Albany's residents and business establishments, is the responsibility of the mayor as ex-officio chairman and a member of the board of water, gas and light commissioners. He is the only publicly elected member of that board which sets utility rates, employs hundreds of citizens and has been depended upon to produce substantial revenue [17] for the operation of the city.

## HISTORICAL PERSPECTIVE

"Mayor" is defined by Webster's New International Dictionary, 2d Edition, as:

"The chief magistrate of a city or borough; the chief executive officer of a municipal corporation. In the United States, he is *elected by popular vote*, and serves from one to four years. . . ." (emphasis added).

The tradition of electing mayors is well established, as is indicated by the following language from The Compact Edition of the Oxford English Dictionary.

"The continued practice of electing mayors in some decayed boroughs (e. g. Queenborough in Sheppey) which had become mere villages or hamlets is a common matter of jesting allusion in the literature of the 17th C."

That dictionary fixes 1297 as the earliest written usage of an early variation of the term, "mayor".

The office of mayor of Albany as created by the legislature of this State and as it has actually functioned, is consistent with this historical concept of the office.

## STATE POLICY

Georgia is divided into 159 counties in each of which there is at least one municipality. Many counties have more than one city or town—*i. e.,* Bibb County has not only Macon but also Payne City; Houston County has Perry, Warner Robins, Centerville, and Bonaire. Book 33 of the Georgia Code Annotated contains a 690 page index

---

17. See n. 8, *supra.*

to all Georgia laws of local and special application in which laws pertaining to each city and town may be located. An examination of that index indicates that the office of mayor is generally mentioned under the name of every city or town.

More detailed information furnished by the research department of the Georgia Municipal Association shows that Georgia, according to the 1970 census, has 575 legislatively incorporated cities and towns.

Municipal charters are granted only by this State's legislature. Under Georgia's constitution and state statutes municipal corporations since 1962 have enjoyed limited "home rule" power. 1933 Ga.Code Ann. § 69–309, *et seq.* Such power specifically excludes the right to fix their own terms or the terms of their successors and the right to alter duties or responsibilities specifically given a particular official or employee by municipal charter. A court procedure for surrendering a corporate charter is now provided, 1933 Ga.Code Ann. § 69–105, but the legislature remains the exclusive body with power to grant a corporate charter. It is therefore apparent that the legislature of this state has been and is the sole body that has provided for the office of mayor in Georgia municipal charters.

The general concept of a Georgia mayor is shown by *Crovatt v. Mason*, 101 Ga. 246, 28 S.E. 891, an 1897 decision in which the Supreme Court of Georgia stated that "[t]he mayor is not only a municipal officer, but he is the *chief* municipal officer highest in grade, and the head of the municipal government. . . ." 101 Ga. at 253, 28 S.E. at 894.

In addition to the general policy in this state of having mayors, and in addition to the historical and legal concept of the mayor as the chief executive officer of a municipal corporation, this state's legislatively expressed public policy as to the City of Albany since 1841 has been to have a municipal government with a mayor.

The specifics of the manner in which Georgia's 575 cities and towns elect their mayors and aldermen or commissioners, have not been a subject of inquiry in this lawsuit. Proof of state policy as to the manner of electing mayors is limited to what is shown by Albany's charter from 1838 until today. That shows that from 1841 until now excepting only 1922 until 1937—15 of 136 years—Albany has had a mayor elected by all the voters of the city.

If the mayor of Albany continues to be elected at large, every Albany voter will have the right to vote for one of six single-member ward commissioners and the right to vote for a mayor. This would be a multi-member system since each voter would participate in electing more than one of Albany's commissioners, the mayor also being a commissioner. Shall Albany's mayor continue to be so elected?

*Does the State Policy of Electing Albany's Mayor At-Large Deserve the Court's Respect or Deference?*

The existing legislative method of electing Albany's mayor being to elect him at-large, a continuation of that method would amount to this court respecting or deferring to this feature of the present state plan. It would in no way be a plan devised by this court or a system imposed by this court. The status quo as to just the office of mayor would simply remain.

The office of mayor existed historically as early as 1297; existed in Albany's charter from and after 1841; and is a standard feature of Georgia's many municipal governments. The office itself "plainly qualifies as established state policy." *Chapman v. Meier*, 420 U.S. at 14, 95 S.Ct. at 760, 42 L.Ed.2d at 777.

The concept of a mayor as the elected representative of all the people of the city serves the obviously rational purpose of having the one official who represents city-wide interests, elected by the real parties at interest—the people—and accountable directly to those real parties at interest at the ballot box. While other systems could be devised and while mayors could even be appointed by the legislative body, this system of electing this office is the choice of this state's legislature in the exercise of its political wisdom.

If six of Albany's commissioners are elected from single-member districts, Albany's Negro population—concentrated as it is in cohesive, large residential areas (see existing five ward plan in which Negro citizens constitute 98.6% of Ward 3 and 63.9% of Ward 2 population) and already represented by commissioners from Wards 2 and 3 who are of the Negro race—will be able to elect a substantial number of Albany's six single-member ward commissioners—at least two—under any fairly conceived and drawn ward plan.

The plaintiffs would naturally prefer that the Mayor's office be included as a single-member post. This of necessity would leave the selection of a mayor not to the people of Albany but to the seven commissioners. From the plaintiff's viewpoint—as their proposed seven member ward plans demonstrate—it would mean a sure opportunity to elect three of seven single-member commissioners and to then extract political promises from commissioners competing for the office of mayor, for their votes as commissioners for the office of mayor. Assuming voting along pure racial lines at the polls and among elected commissioners, this is certainly more advantageous to the plaintiffs than the sure opportunity of electing two of six ward commissioners. But the plaintiffs are not legally or constitutionally entitled to select a scheme that gives them the maximum political advantage in Albany's political processes or to a scheme that guarantees they can elect a number of commissioners that corresponds exactly to their percentage of the population, *Whitcomb v. Chavis, supra,* when a state policy deserving of the court's respect and deference is and has traditionally existed.

It of course can be argued that to elect a mayor at-large and six commissioners from single-member posts is to simply continue to invidiously discriminate. To do so is to engage in sheer speculation. *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975).

It could also be argued that Albany's charter scheme of electing its mayor at large, was conceived to violate the rights of the racial minority, but it has not been so argued. There are no facts to support such an argument even if it were made.

The facts and the long standing state policy behind the at-large post of Mayor of Albany are rationally mandated by the legitimate, important state considerations herein found, see *Chapman v. Meier, supra,* 420 U.S. at 15, 95 S.Ct. at 760, and cases cited, and discussed and even more so by the legitimate state desire to make its own political decisions without interference from the federal judiciary. As the Supreme Court said "a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality. . . ." *Connor v. Finch,* 431 U.S. at 414, 97 S.Ct. at 1833, 52 L.Ed.2d at 474.

The traditional, legitimate state policy of having Albany's mayor elected at large to represent the city-wide interests of the entire population, is deserving of this court's respect and deference.

*Special, Unusual Circumstances Test.*

The special or unusual circumstances test of *East Carroll Parish School Board v. Marshall, supra,* and the other cases already mentioned, has not been specifically discussed and applied to the office of mayor or to the elected presiding officer of any other governmental unit by any decided case known to the court. On the other hand in cases where there were mayors or presiding officers those officers were not included when single-member elections were ordered. They were simply left alone. Note those cases:

The first case involving a municipal government composed of aldermen and a mayor, all elected at-large, was *Wallace v. House,* 515 F.2d 619 (5th Cir. 1975). The municipality was Ferriday, Louisiana, and it had five aldermen and a mayor. The trial court found that the all-at-large aldermanic election scheme operated to unconsti-

tutionally dilute the Negro vote and ordered single-member aldermanic elections. The at-large election of the mayor was not disturbed. The court of appeals considered but did not order the mayor elected from a single member district. They explained in footnote 7:

"7. We note that the mayor of a Louisiana municipality presides at meetings of the board of aldermen and casts the deciding vote in case of an equal division among the aldermen. La.Rev.Stat. 33:404. Since the mayor is elected at-large, La.Rev.Stat. 33:381, his limited voting power must be considered to some extent in deciding whether a particular aldermanic election scheme unconstitutionally abridges the voting rights of minority voters. In this case, it is probable that the mayor of Ferriday will primarily represent the interests of the white voting majority, but plaintiffs do not argue and *we cannot conclude* that this additional factor is a significant one in the circumstances of this case." *Id.* at 625. (emphasis added).

After the court of appeals reversed the trial court and ordered approval of the local government preferred plan of four (4) single-member and one (1) at-large election districts, its decision was reversed and remanded by the Supreme Court for reconsideration in light of *East Carroll Parish School Bd. v. Marshall, supra,* in which as already noted the Supreme Court said:

"We have frequently reaffirmed the rule that when United States district courts are put to the task of fashioning reapportionment plans to supplant concededly invalid state legislation, single-member districts are to be preferred absent unusual circumstances. *Chapman v. Meier,* 420 U.S. 1, 17–19, [95 S.Ct. 751, 761–762], 42 L.Ed.2d 766, 778–780 (1975); *Mahan v. Howell,* 410 U.S. 315, 333, [93 S.Ct. 979, 989], 35 L.Ed.2d 320, 335 (1973); *Connor v. Williams,* 404 U.S. 549, 551, [92 S.Ct. 656, 658], 30 L.Ed.2d 704, 707 (1972); *Connor v. Johnson, supra,* 402 U.S. at 692 [91 S.Ct. [1760] at 1762], 29 L.Ed.2d [268] at 271." 424 U.S. at 639, 96 S.Ct. at 1085, 47 L.Ed.2d at 299.

On remand the Fifth Circuit Court of Appeals continued to leave the mayor elected at-large, ordering single-member elections only for the five aldermanic posts. 538 F.2d at 1138. It is apparent that the appellate court believed the at-large mayor of Ferriday to be encompassed by the "absent unusual circumstances" language; otherwise they would have ordered him elected from a single-member district.

At the same time the circuit judges who decided *Wallace v. House* also decided *Perry v. City of Opelousas,* 515 F.2d 639, (5th Cir. 1975). Opelousas was a Louisiana municipality with a government of five aldermen—four single-member and one at-large—plus a mayor and a chief of police, both elected at-large. 375 F.Supp. 1170. The mayor's powers presumably were the same as recited in *Wallace v. House, supra.* The district court and the appellate court after finding unconstitutional dilution, ordered a change in aldermanic elections but did not disturb the office of mayor.

*Lipscomb v. Wise,* 551 F.2d 1043 (5th Cir. 1977), *rehearing denied,* (July 13, 1977), is a May 9, 1977 decision of the court of appeals reviewing the municipal government of Dallas, Texas. At the time the district court made an uncontested finding of unconstitutional dilution, Dallas City Council consisted of eleven (11) at-large seats, eight (8) having a residency requirement and three having none. One of the three non-residency posts was designated as mayor. As in Albany, the member of council elected as mayor is the presiding officer and has a vote but no veto. The district court approved the plan for relief submitted by the city following the court's finding of dilution. That plan provided for eight single-member and three at-large council members with one of the at-large posts to be mayor and to have the same powers—preside and vote but without veto. The appellate court discusses special circumstances and concludes that "the situation of the Mexican-American voters does not constitute a special circumstance within the contemplation of the cases which require that absent such special circumstances, the city's legislative

body be elected from single-member districts." And then as to the election of the mayor, the court continued:

"No showing has been made as to the city's preference for the election of a mayor if the City is to operate with an eleven member council chosen by districts. Under the present plan, he is required to be the city-wide candidate for 'position' No. 11 of one of the at-large posts. *The City may provide for the election of the mayor by general city-wide election or by election by City Council.* (emphasis added).

"Therefore, the order appealed from is reversed and remanded with instructions for the district court to require the City to reapportion itself into an *appropriate number of single-member districts* for the purpose of holding City Council elections." 551 F.2d at 1048–49. (emphasis added).

It is apparent that the judges who decided *Lipscomb* did not believe that *East Carroll's* preference for single-member districts compels the post of mayor to be a single-member post. If they had, they would not have said specifically that "The City may provide for the election of the mayor by general city-wide election or by election by City Council." The fact that the court did specifically approve city-wide or council election of the mayor seems to clearly indicate that the office is a "special or unusual circumstance."

 ▇▇ While this court does not believe the "special, unusual circumstances" test of *East Carroll* is applicable to the question of whether or not to permit Albany's traditional plan of electing its mayor at-large to continue, if that test were applicable, the office of mayor as elected in Albany in this court's opinion would constitute a "special, unusual circumstance." If not, it would mean that *East Carroll* stands for the further proposition that it is an abuse of discretion for a district court in remedying unconstitutional dilution resulting from a municipal election scheme, to permit a mayor who presides over and votes as a member of city council, to ever be elected by all the voters of the city. It would likewise mean that *East Carroll* since it requires obedience to a preference for single-member districts, mandates that all voting members of city council be elected from single-member districts and if the mayor is to be one of them, he must be selected by those who are elected from single-member districts. Since discretion contemplates a choice to be made by the district court, such an interpretation of *East Carroll* would obviously eliminate all trial court discretion and simply wrap United States District Judges in a "single-member strait jacket". The fears of Mr. Justice Frankfurter so beautifully expressed in *Baker v. Carr,* the beginning of the development of this "the federal common law of voting rights remedies", *Lipscomb v. Wise, supra,* at 1045, would have materialized. Note carefully what he in 1962 saw coming:

"A hypothetical claim resting on abstract assumptions is now for the first time made the basis for affording illusory relief for a particular evil even though it foreshadows deeper and more pervasive difficulties in consequence. The claim is hypothetical and the assumptions are abstract because *the Court does not vouchsafe* the lower courts—state and federal—*guidelines for formulating specific, definite, wholly unprecedented remedies for the inevitable litigations that today's umbrageous disposition is bound to stimulate in connection with politically motivated réapportionments in so many States.* In such a setting, to promulgate jurisdiction in the abstract is meaningless. It is as devoid of reality as 'a brooding omnipresence in the sky,' for it conveys no intimation what relief, if any, a District Court is capable of affording that would not invite legislatures to play ducks and drakes with the judiciary. For this Court to direct the District Court to enforce a claim to which the Court has over the years consistently found itself required to deny legal enforcement and at the same time to find it necessary to withhold any guidance to the lower court how to enforce this turnabout, new legal claim, manifests an odd—indeed an esoteric—conception of judicial propriety.

One of the Court's supporting opinions, as elucidated by commentary, unwittingly affords a disheartening preview of the mathematical quagmire (apart from divers judicially inappropriate and elusive determinants) into which this Court today catapults the lower courts of the country without so much as adumbrating the basis for a legal calculus as a means of extrication. Even assuming the indispensable intellectual disinterestedness on the part of judges in such matters, they do not have accepted legal standards or criteria or even reliable analogies to draw upon for making judicial judgments. To charge courts with the task of accommodating the incommensurable factors of policy that underlie these mathematical puzzles is to attribute, however flatteringly, omnicompetence to judges. The Framers of the Constitution persistently rejected a proposal that embodied this assumption and Thomas Jefferson never entertained it.

"Recent legislation, creating a district appropriately described as 'an atrocity of ingenuity,' is not unique. Considering the gross inequality among legislative electoral units within almost every State, the Court naturally shrinks from asserting that in districting at least substantial equality is a constitutional requirement enforceable by courts. Room continues to be allowed for weighting. This of course implies that geography, economics, urban-rural conflict, and all the other non-legal factors which have throughout our history entered into political districting are to some extent not to be ruled out in the undefined vista now opened up by review in the federal courts of state reapportionment. To some extent—aye, *there's the rub. In effect, today's decision empowers the courts of the country to devise what should constitute the proper composition of the legislatures of the fifty States.* If state courts should for one reason or another find themselves unable to discharge this task, the duty of doing so is put on the federal courts or on this Court, if State views do not satisfy this Court's notion of what is proper districting.

"We were soothingly told at the bar of this Court that we need not worry about the kind of remedy a court could effectively fashion once the abstract constitutional right to have courts pass on a state-wide system of electoral districting is recognized as a matter of judicial rhetoric, because legislatures would heed the Court's admonition. This is not only a euphoric hope. It implies a sorry confession of judicial impotence in place of a frank acknowledgment that there is not under our Constitution a judicial remedy for every political mischief for every undersirable exercise of legislative power. The Framers carefully and with deliberate forethought refused so to enthrone the judiciary. In this situation, as in others of like nature, appeal for relief does not belong here. Appeal must be to an informed, civically militant electorate. In a democratic society like ours, relief must come through an aroused popular conscience that sears the conscience of the people's representatives." *Baker v. Carr,* 369 U.S. 186, at 267, 82 S.Ct. 691 at 738, 7 L.Ed.2d 663 at 715 (1962). (emphasis added).

Presently this court does not believe that district courts are totally without discretion.

*Conclusion as to the Mayor and Commissioners*

■ In deference to and respect for the State of Georgia's legitimate, traditional policy of electing Albany's mayor at-large and yet mindful of the Supreme Court's preference for single-member districts, it is this court's considered judgment that Albany must hereafter be governed by a seven member board of city commissioners, six of whom shall be elected from and by just the voters of each of six single-member wards and one of whom shall be the mayor and elected from the city at-large by all the voters of the city. The commissioners thus elected, if they deem the office of mayor pro tem to be needed, may elect one of their members to that office and when so elected,

he shall be entitled to exercise the powers of that office.

## REDRAWING ALBANY'S WARDS TO PROVIDE FOR SIX SINGLE–MEMBER WARDS

▮ Following entry of an order delaying the August 9, 1977, primary election until Tuesday, October 4, 1977, and requesting receipt of proposed seven-ward and six-ward reapportionment plans, the court received such plans from the private plaintiffs, the United States and the defendants. After coming to the conclusion that the appropriate remedy is six single-member districts, those plans were carefully studied keeping in mind that "the court's task is inevitably an exposed and sensitive one that must be accomplished circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.' *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620," and further, that in performing such task legislative districts should be drawn "reasonably contiguous and compact, so as to put to rest suspicions that Negro voting strength is being impermissibly diluted, or [the District Court should] explain precisely why in a particular instance that goal cannot be accomplished." *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d at 474, 481.

For its use the court had the maps and 1970 census data furnished by the parties in 1975 and a recent Dougherty Area Regional Transportation Study showing the racial composition of Albany's population in various areas of the city.

Since an election must soon be conducted, the court has noted Albany's election districts and endeavored to avoid causing those districts and those corresponding voluminous computerized records which show where each voter lives and in which ward and voting precinct he can vote, to be changed anymore than necessary.

The plaintiffs' and the defendants' plans troubled the court in one common respect— they each are prepared and submitted by advocates aiming to secure the most they can for their respective sides of this political struggle. The plaintiffs naturally suggest a plan gerrymandered to give the black 40% a "sure" opportunity to elect three (3) of six (6) ward commissioners. The defendants naturally suggest a plan in which there are two safe black districts, one "betwixt and between" and three safe white districts. Feeling that each plan reflected the natural partisan wishes and desires of those who submitted them, the court did not adopt either suggested plan but instead proceeded to draw its own plan endeavoring to reach a result that is fair to all and in compliance with the "one-man, one-vote" rule.

The wards as drawn on the large map labeled "court plan" which corresponds in size to the maps showing the transportation study data and on the smaller map appended hereto as Exhibit "A" have the following population:

| | Total | | Population by Race (Percentage) | |
|---|---|---|---|---|
| WARD | Population | Deviation | White | Black |
| 1 | 12,665 | − .4% | 9,499 (75%) | 3,166 (25%) |
| 2 | 12,732 | + .2% | 7,385 (58%) | 5,347 (42%) |
| 3 | 12,503 | − 1.6% | 250 ( 2%) | 12,253 (98%) |
| 4 | 12,806 | + .7% | 12,294 (96%) | 512 ( 4%) |
| 5 | 12,803 | + .7% | 12,675 (99%) | 128 ( 1%) |
| 6 | 12,692 | − .2% | 4,315 (34%) | 8,377 (66%) |
| TOTALS | 76,201 | | 46,418 (60%) | 29,783 (39.1%) |

Ideal Ward Population = 12,700
Total Population Deviation = 2.3%

Albany's present charter provides for (a) four of its commissioners—Mayor, Mayor Pro Tem and First and Fourth Ward Commissioners to be elected this year for terms to begin on the second Monday in January 1978, and

(b) three of its commissioners—Second, Third and Fifth Ward Commissioners to be elected in 1978 for terms to begin on the second Monday in January, 1979. Wards have been numbered so as to conform as close as possible to the numbering pattern of the past, so that the present system of electing four commissioners in odd numbered years and three in even numbered years can continue.

In preparing its plan the court was unaware of the residence addresses of incumbent commissioners and of even the names of those who desire to run this year.

## THE TOTAL REMEDY

To effect the changes heretofore factually, constitutionally, and legally found to be necessary to remedy the Fourteenth and Fifteenth Amendment constitutional deprivations and violations herein found, Albany's Board of City Commissioners from and after this date shall consist of seven commissioners, six of whom shall reside in and be elected only by the voters of each of the six wards as reapportioned in the manner shown on the court's six-ward plan and the appended smaller version, Exhibit "A"; and one of whom shall be mayor, may reside anywhere in the city and shall be elected by all the voters of the city.

1977 primary elections shall be held on Tuesday, October 4, 1977, and if necessary, primary run-off elections shall be held on Tuesday, October 18, 1977. Candidate qualifying shall open at 9:30 a. m., Wednesday, August 24, 1977, and remain open until 5:00 p. m., Tuesday, September 6, 1977. Candidates who qualified before this court's order of July 11, 1977, and who do not continue as candidates shall be entitled to withdraw and receive a refund of any fees paid. The 1977 general election and all subsequent elections shall be held on the dates established by state law.

The following and only the following commissioners shall be elected by and in the 1977 primary and general elections—Mayor and Commissioners from the First, Fourth and Sixth Wards, the Sixth Ward Commissioner post being substituted in Albany's charter election time-table for the present post of mayor pro tem. Commissioners for the Second, Third and Fifth Wards shall be elected in 1978 primary and general elections.

The office of mayor pro tem, if it is deemed necessary and desirable by the commissioners, shall be filled by vote of all the commissioners each January immediately following the qualification and installation of those commissioners elected at the preceding duly conducted general election. Since some commissioners are elected each year—4 one year and 3 the next—and since in fairness all commissioners should be given an opportunity to vote on every mayor pro tem, the term for which the mayor pro tem is elected shall be "one year and until his successor is elected and qualified" instead of two years as the charter now provides. The first election of a mayor pro tem by all of Albany's commissioners, if it is held, shall be in January, 1978.

No other changes being deemed necessary, the elections to be hereafter conducted for commissioners of the City of Albany shall in all respects other than as herein altered and changed, be conducted in accordance with the laws of the State of Georgia; and the affairs of the City of Albany shall be governed by the general laws of the State of Georgia and its charter except as it is changed or altered by this order.

This constitutes the court's order enjoining the defendant officials of the City of Albany, their successors in office, agents, employees, and attorneys and all persons who receive actual notice of this order by personal service or otherwise, Rule 65(d), Federal Rules of Civil Procedure, from conducting elections for commissioners of the City of Albany or the affairs of the City of Albany in any manner inconsistent with this order.

This order shall remain in full force and effect until further order of the court. Jurisdiction is specifically retained to pass such further orders as may be necessary to implement this order.

APPENDIX

EXHIBIT "A"

CITY WARD PLAN AUGUST 23, 1977

ALBANY, GEORGIA. BASE MAP